STATE BOARD OF BARBER EXAMINERS *v.* CLOUD ET AL.

[No. 27,708. Filed November 30, 1942. Rehearing denied December 21, 1942.]

554

*George N. Beamer,* Attorney General, *James K. Northam,* First Assistant Attorney General, *Obed T. Kilgore,* and *C. Ballard Harrison,* Deputy Attorneys General, for appellant.

*Claude Cline,* of Huntington, for appellee.

*Henry M. Dowling,* of Indianapolis, *amicus curiae.*

RICHMAN, C. J.—Appellees sued for a permanent injunction against the enforcement of appellant's administrative order fixing for Huntington County the minimum prices barbers therein might charge for their services and the hours when their shops might be open for business. Demurrer to the complaint was overruled and, refusing to plead over, appellant suffered

judgment granting the injunction. The question in this appeal therefrom is whether such administrative orders are within the police power of the State.

Until 1933 barbers and their shops were under no regulation other than the general laws respecting public health, morals and safety. A Sunday closing law applicable only to barber shops was enacted in 1907 but held unconstitutional as class legislation in *Armstrong* v. *State* (1908), 170 Ind. 188, 84 N. E. 3. The State Board of Barber Examiners, whose administrative office is in Indianapolis, was established by chapter 48. of the Acts of 1933. All barbers are now required to be licensed by this board. Besides prescribing under penalty certain unsanitary practices the statute authorized the board to make "other rules and regulations and prescribe other sanitary requirements." Twelve such rules are now in effect. Horack, Indiana Administrative Code, Rules 63-323-1 et seq. Neither this statute nor any of the rules adopted by the board has been the subject of litigation reaching this court.

Chapter 108 of the Acts of 1939 provided that minimum prices and opening and closing hours in barber shops might be fixed by the board in "trade areas" if desired by eighty percent of the barbers in the respective areas, the limits of which the resident barbers were to determine. In *Hollingsworth* v. *State Board of Barber Examiners* (1940), 217 Ind. 373, 28 N. E. (2d) 64, the principal sections of the law were declared "void as constituting an unconstitutional delegation of legislative authority."

The next General Assembly passed the act now before us. Acts 1941, ch. 77, § 63-342 to § 63-352, Burns' 1933 (Supp.), § 4082-15 to § 4082-24, Baldwin's Supp. 1941. The first section states that the statute is "in the interest of the public health, public safety and general welfare,"

that "barbering and the operation of barber shops is hereby declared to be affected with a public interest; that in order to attain the purposes of this act in promoting and conserving fair competition and salutary and sanitary practices among barbers, reasonable minimum charges should prevail for services customarily performed by barbers in barber shops and reasonable opening and closing hours for barber shops should be established, . . ."

The third section permits the board, upon its own motion only, to investigate and make orders as to minimum prices and hours in areas to be fixed by the board in its discretion. The fourth prescribes the procedure with reference to such investigations and further states:

"In making any investigation as to conditions existing in the barber profession, the board shall give due consideration to the costs incurred in the particular county under investigation with regard to adequacy of income of barber shop operators to assure full compliance with all sanitary regulations imposed by any law of this state and the board shall give due consideration to healthful and reasonable working conditions and hours of service in barber shops."

The provision for notice and hearing applies only to the preliminary investigation. Any order formulated need not be made known until it is issued when it becomes effective after notice, the time of which is not fixed by the statute, without provision for administrative or judicial review. The sixth section provides that all orders so made shall remain in force until changed by the board after investigation as in the case of the original orders. The eighth permits the board to revoke a barber's license for any violation of such an order. Other sections are immaterial to this inquiry.

The complaint shows that in the main business district of the City of Huntington are six barber shops

which had been operating under a voluntary schedule of prices and hours which the nine appellees, each of whom owned and operated a shop in the outlying districts of the city, could not meet without serious loss of business and income; that an investigation was begun by the board by notices of a hearing, which were printed in Huntington, prepared for mailing and mailed by one of the owners of the said six shops; that on the eve of the hearing the board was in secret session with the operators of four of the shops and at the hearing these operators expressed themselves as satisfied with said schedule; that no evidence was heard as to the expenses or income of these operators but

". . . evidence was produced by the plaintiffs herein showing that because of the location of the Plaintiffs' shops herein and because of lower rentals and operating costs they were able to operate each of their shops at prices less than those as promulgated by the said defendant Barber Board; and that said prices and hours under which plaintiffs were operating their shops were sufficient to assure full compliances with all sanitation regulations required by law and giving consideration to healthful and reasonable working conditions and hours of service in their respective shops;"

that the board adopted said schedule and by order made it effective throughout Huntington County. Other facts alleged need not be detailed.

The complaint not only challenges the order as arbitrary, discriminatory and destructive of appellee's business but asserts that the statute, pursuant to which the board was acting, contravenes among others § 1 and § 23 of Article 1 of the Constitution of the State of Indiana.

Appellant justifies the order as lawfully made pursuant to a proper exercise of the police power. The statute is defended as being "in the interest of the public health . . . and general welfare." There is no

contention for the legislative declaration that it is for the "public safety."

Statutes and ordinances applying the police power to barbers and barber shops have been the subject of much litigation. Most of the earlier cases deal with regulation of hours of opening and closing. About 1936 price legislation appeared, and some of the later cases involve both kinds of legislation. The substantial questions before us have been considered in one or more of the following cases.

### Regulation of Hours

Ordinances Upheld:

*Falco* v. *Atlantic City* (1923), 99 N. J. L. 19, 122 A. 610.

*Feldman* v. *City of Cincinnati* (1937), 20 F. Supp. 531.

*Pearce* v. *Moffatt* (1939), 60 Idaho 370, 92 P. (2d) 146.

Ordinances Held Unconstitutional:

*City of Atlanta* v. *Chaires* (1927), 164 Ga. 755, 139 S. E. 559, 55 A. L. R. 230.

*State ex rel. Newman* v. *City of Laramie* (1929), 40 Wyo. 74, 275 P. 106.

*City of Alexandria* v. *Hall* (1930), 171 La. 595, 131 So. 722.

*Knight* v. *Johns* (1931), 137 So. 509 (Miss.).

*Ernesti* v. *City of Grand Island* (1933), 125 Neb. 688, 251 N. W. 899.

*McDermott* v. *City of Seattle* (1933), 4 F. Supp. 855.

*Patton* v. *Bellingham* (1934), 179 Wash. 566, 38 P. (2d) 364.

*Ganley* v. *Claeys* (1935), 2 Cal. (2d) 266, 40 P. (2d) 817.

*City & County of Denver* v. *Schmid* (1935), 98 Colo. 32, 52 P. (2d) 388.

*State ex rel. Pavlik* v. *Johannes* (1935), 194 Minn. 10, 259 N. W. 537.

*Eanes* v. *City of Detroit* (1937), 279 Mich. 531, 272 N. W. 896.

*State* v. *Paille* (1939), 90 N. H. 347, 9 A. (2d) 663.

*City of Louisville* v. *Kuhn* (1940), 284 Ky. 684, 145 S. W. (2d) 851.

Statutes Held Unconstitutional:

*Ex parte Jentzsch* (1896), 112 Cal. 468, 44 P. 803.

*In re Boehme* (1936), 12 Cal. A. (2d) 424, 55 P. (2d) 559.

*Opinion of the Justices* (1938), 300 Mass. 615, 14 N. E. (2d) 953.

*Amitrano* v. *Barbaro* (1938), 61 R. I. 424, 1 A. (2d) 109.

*State* v. *Danberg* (1939), 40 Del. 136, 6 A. (2d) 596.

### *Regulation of Prices*

Statutes Upheld:

*Board of Barber Examiners* v. *Parker* (1938), 190 La. 214, 182 So. 485.

*Herrin* v. *Arnold* (1938), 183 Okla. 392, 82 P. (2d) 977, 119 A. L. R. 1471.

*State* v. *McMasters* (1939), 204 Minn. 438, 283 N. W. 767.

*Arnold* v. *Board of Barber Examiners* (1941), 45 N. Mex. 57, 109 P. (2d) 779.

*McRae* v. *Robbins* (1942), — Fla. —, 9 So. (2d) 284.

Ordinances Held Unconstitutional:

*City of Mobile* v. *Rouse* (1937), 233 Ala. 622, 173 So. 266, 111 A. L. R. 349.

*In re Kazas* (1937), 22 Cal. A. (2d) 161, 70 P. (2d) 962.

Statutes Held Unconstitutional:

*Duncan* v. *City of Des Moines* (1936), 222 Iowa 218, 268 N. W. 547.

*State ex rel. Fulton* v. *Ives et al.* (1936), 123 Fla. 401, 167 So. 394.

*State* v. *Greeson et al.* (1939), 174 Tenn. 178, 124 S. W. (2d) 253.

*Hollingsworth* v. *State Board of Barber Examiners* (1940), 217 Ind. 373, 28 N. E. (2d) 64.

*Noble* v. *Davis* (1942), — Ark. —, 161 S. W. (2d) 189.

These cases comprise most of the law on the subject. Notes that have been helpful are found in 20 A. L. R. 1112, 98 A. L. R. 1088, 111 A. L. R. 353, 119 A. L. R. 1481, 17 Ind. L. J. 192.

There is no contention on the part of appellees that barbers and their places of business are not subject to the police power in the interest of public health. But the right to regulate for some purposes and in some ways does not include the right to regulate for all purposes in all ways. Appellees are licensed pursuant to the Act of 1933, which was clearly a sanitary measure. That they acquiesced in such an exercise of the police power, accepting licenses under that act, is no reason why they may not attack as beyond the police power a different kind of regulation permitted by the Act of 1941.

We discard appellant's contention also that a dictum in *Hollingsworth* v. *State Board of Barber Examiners, supra,* is a precedent for the decision of the case before us. Any assumption therein that price and hours legis-

lation for barbers may be validly enacted was only for the purpose of demonstrating that the method used in the Act of 1939 was invalid. This was the only question intended to be or in fact decided.

In the Arkansas Act of 1941 was a declaration similar to that quoted from § 1 of the Indiana act. Of this legislative declaration Judge McHaney said in *Noble* v. *Davis, supra* (161 S. W. (2d) 189, 191):

"That portion of Section 1 of said Act 432, above quoted, where the legislature declared that the purpose of the Act is the protection of the public health, safety, etc. is the declaration of a non-existent fact. The fact that the legislature so declared the purpose of the Act does not make it so, if in fact, the declared purpose has no substantial connection with the real purpose of the Act."

The same principle is stated in 11 Am. Jur. *Constitutional Law* § 303 at p. 1077, harmonizing with the rule declared by this court in *Blue* v. *Beach* (1900), 155 Ind. 121, 131, 56 N. E. 89, 93, as follows:

"As a general proposition, whatever laws or regulations are necessary to protect the public health and secure public comfort is a legislative question, and appropriate measures, intended and calculated to accomplish these ends, are not subject to judicial review. But, nevertheless, such measures or means must have some relation to the end in view, for, under the mere guise of the police power, personal rights and those pertaining to private property will not be permitted to be arbitrarily invaded by the legislative department; and consequently its determination, under such circumstances, is not final, but is open to review by the courts. If the legislature, in the interests of the public health, enacts a law, and thereby interferes with the personal rights of an individual, destroys or impairs his liberty or property, it then, under such circumstances, becomes the duty of the courts to review such legislation, and determine whether

it in reality relates to and is appropriate to secure the object in view; and in such an examination the court will look to the substance of the thing involved, and will not be controlled by mere forms."

Judge McHaney said that the connection between the provisions of the Arkansas Act and the public health "is visionary and not real." The Indiana Act is similar and merits the same criticism. If a barber has a contagious or infectious disease, if his tools are contaminated, or his shop is unsanitary, the patron who receives a haircut or shave in the middle of the afternoon is just as likely to be infected as one who enters the shop at nine o'clock in the evening. The amount of his gross or net income is unrelated to sanitation. Cleanliness and antisepsis are inexpensive. Limited amounts of forty per cent formaldehyde, two per cent carbolic acid solution and soap are the only disinfectants that need be purchased under the board's present rules. Laundry and the labor of scrubbing seem to be the only other necessary elements of cleanliness. It is within the means of any barber to have a sanitary shop and, it might be suggested, he is not likely to have much business if it is unsanitary. Moreover, under the Act of 1933 the board has adequate authority to enforce cleanliness in barber shops and to prevent diseased barbers from plying their trade. They are also subject to all reasonable regulations of state and local boards of health. The Act of 1941 therefore was unnecessary to conserve the health of the general public. The declarations in § 1, with respect to public health and sanitation, seem to us to have no substantial basis in fact and may have been inserted in an effort to lend color of constitutionality to a law that could not otherwise be sustained.

While it is conceivable that shorter hours might re-

sult in better health of the barber himself, such an end is beyond the purview of the act. It provides for orders limiting the hours when a shop may be kept open. It does not limit the hours of labor of any barber. The particular order would permit him to work ten hours daily plus three additional hours on Saturdays and days preceding holidays. In *Patton* v. *Bellingham, State* v. *Paille, Opinion of the Justices, State ex rel. Pavlik* v. *Johannes,* and *Eanes* v. *City of Detroit, supra,* the courts decided that the barbers' health was not the object of legislation prescribing opening and closing hours of barber shops and with this conclusion we agree. There is nothing peculiar in the work of a barber that calls for special or class legislation to protect his health. See *In re Boehme, supra.* From any viewpoint therefore we are unable to see a substantial relation between the provisions of this act and the public health. The same conclusion was reached in *Knight* v. *Johns, City & County of Denver* v. *Schmid, Eanes* v. *City of Detroit, State* v. *Paille, City of Louisville* v. *Kuhn, Opinion of the Justices, State* v. *Greeson et al., In re Kazas, supra.*

Some courts have suggested that uniform hours are necessary to facilitate inspection. See *Feldman* v. *City of Cincinnati* and *Falco* v. *Atlantic City, supra.* There is no practical or constitutional reason why a barber shop may not be inspected by day or by night, in working hours or when the shop is closed. See *State ex rel. Melton* v. *Nolan* (1930), 161 Tenn. 293, 30 S. W. (2d) 601. One of the grounds urged for regulation is "too long hours" which seems to imply that the outlying shops are open not only after but during the time when the downtown shops are open. If so then all may be inspected with equal facility to ascertain whether unsanitary operating practices

exist. If it is necessary that the shop be closed for inspection or sanitation, reasonable rules to that end may be adopted and enforced. It is absurd to hold that facility of inspection, or, in other words, the convenience of the inspector, who visits a shop perhaps four times a year, is sufficient reason for shortening, or lengthening, the daily hours of business. The inspection argument is considered and rejected in *State* v. *City of Laramie, In re Boehme, Ganley* v. *Claeys, City of Alexandria* v. *Hall, State* v. *Paille, Knight* v. *Johns,* and *Ernesti* v. *City of Grand Island, supra.*

Price fixing legislation such as this has been sustained in Louisiana, Oklahoma, Minnesota, New Mexico and Florida, rejected in Alabama, California, Iowa, Florida, Tennessee and Arkansas. See cases *supra.* There was dissent in most of the cases. Where the courts were divided it is apparent that those courts and those judges who have sustained the legislation, while usually basing their opinions on some supposed relationship between prices and health, have in fact been following or attempting to anticipate the "drift" referred to by Mr. Justice Douglas in *Olsen* v. *Nebraska ex rel. Western Reference & Bond Association* (1941), 313 U. S. 236, 85 L. Ed. 820, 61 S. Ct. 862, 133 A. L. R. 1500. The courts and judges who have taken the opposite view have stressed the constitutional safeguards for individual rights and liberties as not permitting such legislative application of the police power. For instance in *Herrin* v. *Arnold, supra,* wherein the Oklahoma act was upheld, the court refers to cases *contra* where there was dissent and says (82 P. [2d] 982):

> "The opinions of the dissenting judges in these cases are more in keeping with the present decisions of the United States Supreme Court."

The "present decisions" referred to are probably the

price fixing cases listed by Mr. Justice Douglas in the Olsen case. Most of them have nothing to do with public health, for instance, those regulating commissions of agents of fire insurance companies and of traders "in interstate commerce live stock," maximum tobacco warehouse and employment agency charges and price fixing provisions of the Bituminous Coal Act. These were economic measures. Not a few involved federal legislation in the regulation of interstate commerce. A trend along these lines does not constitute precedent for approval of state price fixing in the guise of exercise of the police power.

In *Tyson and Brother* v. *Banton* (1927), 273 U. S. 418, 71 L. Ed. 718, 47 S. Ct. 426, by a five to four decision the court held unconstitutional a New York statute fixing the maximum profit a "scalper" might charge upon his resale of a ticket to a public theater. Mr. Justice Holmes dissented in a short opinion one phrase of which is stressed herein by appellant: "The truth seems to me to be that, subject to compensation when compensation is due, the legislature may forbid or restrict any business when it has a sufficient force of public opinion behind it." We may agree with his conclusion that the particular statute was a valid exercise of the police power without accepting the above statement, particularly if it is to be given the significance apparently intended by appellant, namely, that the declaration of the Legislature in this act evidences a public opinion supporting the legislation and binding upon the court. Such a concept implies legislative supremacy and is at variance with fundamental principles of American constitutional government. Not infrequently, we have observed, legislation in behalf of a class is due to "pressure groups" rather than a state wide public opinion.

The case of *Nebbia* v. *New York* (1934), 291 U. S. 502, 78 L. Ed. 940, 54 S. Ct. 505, is supposed to have marked a turn in price fixing legislation. When the milk supply of a whole state is threatened by an economic war in the industry it is apparent not only that the public health is in danger but that from an economic standpoint the welfare of the public is involved. While the police power was there exercised in a new way, we do not regard the decision as a departure from old principles. Accord, *Albert* v. *Milk Control Board of Indiana* (1936), 210 Ind. 283, 200 N. E. 688, where price fixing legislation considered to be remedial was sustained. In these cases the police power was sustained because vital interests of the whole public were concerned. This court in the Albert case, *supra,* discerned that those interested were not few in number nor confined to one small trade or business, but that generally over the State, regardless of their age, sex, occupation or station in life, the people as a whole were affected by the condition sought to be remedied. Because of this fact it was declared "that the milk business is affected with a public interest," a phrase that has been criticised in some recent cases. See *Olsen* v. *Nebraska* (313 U. S. at p. 245), where Mr. Justice Roberts is quoted as having said that " 'affected with a public interest' can mean 'no more than that an industry, for adequate reason, is subject to control for the public good.' " The old phrase by its application to specific factual situations had acquired a meaning which served measurably as a basis for new application. Does not the alternative statement by Mr. Justice Roberts leave for determination in every case the questions of what reason is "adequate" and what is the "public good"?

In the Kazas case *supra,* it is said (70 P. [2d] 968):

"We may thus fairly conclude that the term 'general welfare' means just what it literally implies, namely, that legislation to be justified and supported by that term must at least promote the welfare of the general public as contrasted with that of a small percentage or insignificant numerical proportion of the citizenry. This conclusion is supported by every case on that subject which we have cited and many others we have read."

It is said in one of the briefs that the barber business "immediately concerns only one-fourth of one per cent of the population of Indiana." Whether or not the figures are correct, we know that barbers are few in number as compared with the whole population. The smallness of the group does not militate against such remedial measures as are necessary to protect the general public against danger coming from the group. But on the other hand we think the police power ought not be used for the financial benefit of a relatively small group in the guise of legislation for the public welfare. Particularly is this true when the great majority of the people including the dissenting barbers will not be benefited but perhaps be hurt by the price legislation. The possibility of a general economic benefit because of financial benefit to barbers as a class is too remote to be considered as being in the public welfare. Using the formula stated by Mr. Justice Holmes, the "public good" is not conserved and the reason for regulation is not "adequate." Using the older phrase, the barber business is not so "affected with a public interest" as to justify the measures provided in this act.

Indiana and Florida probably have about the same

ratio of barbers to total population. Judge Ellis in the Ives case said (167 So. 401) :

"The assumption that the barber trade, business, profession, or industry variously referred to in the act is a chief industry of the state of Florida so that its general welfare and prosperity depend upon it in a very large and real sense is a postulate unfounded in history, fact, or experience. It is so egregiously erroneous that its illusion may be said to be a matter of common knowledge."

Since that case was decided the Supreme Court of Florida has refused to apply its principles to similar legislation in behalf of the laundry and dry cleaning industry. *Miami Laundry Co.* v. *Florida Dry Cleaning and Laundry Bd.* (1938), 134 Fla. 1, 183 So. 759, 119 A. L. R. 956. Judge Brown, who concurred in the former decision but not in all the reasoning of the majority, dissented in the latter with an able and scholarly opinion. He is clear and positive in his conviction that from an economic standpoint or as a public welfare measure, the Ives case was correctly decided and should have been followed in the laundry case. He says (183 So. 777) :

"In the Ives Case, this court held that there was a limit beyond which the legislature could not go, and that, as to price-fixing legislation as applied to private business, the legislature could not constitutionally exercise that power except when dealing with some basic or paramount industry which vitally affects the public health and welfare of the general public of the State. If we are to depart from this general principle, and open the floodgates for legislative control or regulation of prices in any private business or avocation which the legislature shall state in the act is for the public health or welfare, let the people first pass on this momentous and far reaching question by the adoption, or the refusal to adopt, a constitutional amendment on the subject, if the proponents of this de-

parture from our previous construction of the constitutional guarantees see fit to secure the submission of such an amendment."

The most recent Florida case, *McRae* v. *Robbins* (1942), 9 So. (2d) 284, 287, is the only price fixing barber case we have found which does not to some extent rely upon the right to exercise the police power in the interests of the public health. The Ives case is not overruled, unless by inference. The authority exercised is said to be found not in the interest of public health or general welfare but in a clause of the Florida constitution, unnoted in the Ives case, granting "the Legislature full power to enact laws designed for the correction of abuses and to prevent unjust discrimination and excessive charges by persons and corporations engaged as common carriers in transporting persons and property, 'or performing other services of a public nature. . . .' " The majority opinion states that "prices of gas, water and electricity have been regulated by acts enacted under this provision" from which the court concludes, without elaboration, that barbers' services are "of a public nature." The analogies are not convincing. It will be noted further that, aside from Florida cases, the authorities cited comprise cases in the United States Supreme Court beginning with the Nebbia case and concluding with *Duckworth* v. *Arkansas* (1941), 314 U. S. 390, 86 L. Ed. 294, 62 S. Ct. 311, 138 A. L. R. 1144, which holds only that certain state regulation of transportation of intoxicating liquor does not unduly encroach upon the power delegated to Congress by the "commerce clause." These authorities are no more persuasive than the court's argument. Judge Brown, again dissenting, called attention to the far reaching consequences of the decision, saying (9 So. [2d] 292) :

"And of course if this act is upheld the legislature can later provide a commission of physicians to prescribe minimum fees to be charged by doctors to the public for their services, and the same thing could be done for the dentists, the lawyers, the osteopathic practitioners, the chiropractors, and all other professions."

In answer to this argument it has been said that these other professions have not been shown to need regulation. In other words, "sufficient unto the day is the evil thereof." The Supreme Court of New Mexico in the Arnold case did not attempt an answer. Quoting counsel therein as saying: "Where is such regulation to end if price fixing can apply to the barber trade and business?" the court remarked (45 N. Mex. 70):

"Much can be said upon this question, as indeed much has already been said by other courts, and it does present a most challenging query. But the answer must await the actual presentation of the problem to be solved."

We are not satisfied thus to leave the question. One of the most helpful methods of testing the soundness of a principle or its application to a given state of facts is by attempting to apply it to a similar factual situation. Are we ready to extend to other businesses and professions price fixing measures such as this? Should the members of one of the so-called learned professions be molded in one pattern at one price with no extra financial reward for peculiar ability, skill or education? See *In re Kazas*. Some business and professional men are in contact with the public much more realistically than barbers. The butcher's product goes into every kitchen. The doctors enter every home. They are exposed to contagion or infection which they might easily carry from one patient to another. If they should be regulated as to hours and prices, which

direction will the regulation take, upward or downward? There is as much logic in fixing maximum as minimum prices, in fixing longer hours as shorter hours. We quote from *State* v. *Greeson,* wherein the members of the Supreme Court of Tennessee were unanimous (124 S. W. [2d] p. 258):

> "If the Act in question is valid, then the Legislature can directly, or through a board, fix the fees that physicians and dentists may charge for their services; the prices that hotels, restaurants and lunch counters may charge for food; the prices of meats, packing house and canning factory products; and so on ad infinitum until the liberty of the individual and the right to contract is destroyed. As stated by the Supreme Court of the United States in *Lochner* v. *New York, supra:*
>
> " 'It must, of course, be conceded that there is a limit to the valid exercise of the police power by the state. There is no dispute concerning this general proposition. Otherwise the 14th Amendment would have no efficacy and the legislatures of the states would have unbounded power, and it would be enough to say that any piece of legislation was enacted to conserve the morals, the health, or the safety of the people; such legislation would be valid, no matter how absolutely without foundation the claim might be. The claim of the police power would be a mere pretext,—become another and delusive name for the supreme sovereignty of the state to be exercised free from constitutional restraint.' "

Unless these other businesses and professions are amenable to price fixing regulations similar to those in this act, the barber business, notwithstanding the legislative declaration, is not subject to this kind of regulation. If the people of Indiana want such legislation then, as pointed out by Judge Brown, there is an orderly method by which it may be accomplished.

The individual's right to engage in a lawful business, to determine the price of his labor and to fix the hours

when his place of business shall be kept open, except as they conflict with the police power, are personal privileges and liberties within the protection of the Indiana Bill of Rights. It was so held in *Street* v. *Varney Electrical Sup. Co.* (1903), 160 Ind. 338, 66 N. E. 895, which struck down as violating Article 1, Section 1 of the Constitution, a statute fixing a minimum rate of wages to be paid unskilled labor upon any public work. The court said (p. 341):

> "It is not contended, and it could not be maintained, that the restrictions in this act upon the right of contract would be valid if the act applied to the work and affairs of private citizens. Even if no express provision of any constitution forbade such legislative interference with the right of contract, it would be void for the reason that the authority to fix by contract the prices to be paid for property, including human labor, is not ordinarily within the domain of legislation. But such enactments are also held to be in violation of § 1, article 1, of the state Constitution, securing to every citizen of the State the inalienable right to personal liberty and to the pursuit of happiness."

and (p. 347):

> "Lastly, we think the statute obnoxious to the objection of class legislation. In fixing the minimum rate of wages to be paid for unskilled labor to be employed by counties, cities, and towns, on public improvements, a classification is made which is unnatural and unconstitutional."

As before stated there is no adequate reason why barbers as a class should be singled out for price legislation, so that what was said in the Street case, *supra*, as to class legislation also applies to the statute which we are now considering. Sections 2 and 18 of Article II of the Arkansas Constitution, held to have been violated in *Noble* v. *Davis, supra,* are

similar to Sections 1 and 23 of Article I of the Indiana Constitution. Without regard to other questions presented, we hold that there was no valid legislative authority for the order made by appellant in this case and that its enforcement was properly enjoined. We express no opinion as to the validity of § 7 of the Act relative to barber schools. The first six sections must fall with the invalid provisions as to fixing of prices and hours.

The decree is affirmed.

NOTE.—Reported in 44 N. E. (2d) 972.