DICKSON, Justice,
concurring in result.
I would affirm the trial court's dismissal of the complaint, thus reaching the same outcome as the majority opinion, but for different reasons. The majority leaves open the question of whether Article 1, Section 1, of the Indiana Constitution should be interpreted to provide protection for a right to abortion. I prefer this Court to address that question and to explicitly declare that the Indiana Constitution does not protect any alleged right to abortion. In addition, because the challenged statutory pre-abortion requirements not only discourage harm to fetal life, but also protect the health of pregnant women, particularly in light of the risks to women from post-abortion psychological harm, I am convinced that these requirements not only are a proper exercise of legislative power but also are in direct harmony with and furtherance of core values of Article 1, Section 1, of the Indiana Constitution, which declares the inalienable right of "life" and the institution of government for the "peace, safety, and well-being" of the people.
It is important to realize what this case is not about. The issue before the Court is not whether abortion is morally right or wrong, or whether it is wise or unwise. These questions are vigorously debated among our citizens. Regardless of one's personal opinion on these issues, the proper resolution of this case is properly grounded on well-established principles of Indiana law.
Central to this case are the opening words of Section 1 in Article 1 of Indiana's 1851 Constitution:
WE DECLARE, That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being.
As we have repeatedly emphasized, the interpretation and application of provisions of the Indiana Constitution require
a search for the common understanding of both those who framed it and those who ratified it. Furthermore, the intent of the framers of the Constitution is *989 paramount in determining the meaning of a provision. In order to give life to their intended meaning, we examine the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our Constitution, and case law interpreting the specific provisions. In construing the Constitution, we look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy.
City Chapel v. South Bend, 744 N.E.2d 443, 447 (Ind.2001); see also Jordan v. Deery, 778 NE.2d 1264, 1268 (Ind.2002); McIntosh v. Melroe Co., 729 N.E.2d 972, 974, 986 (Ind.2000); Ajabu v. State, 693 N.E.2d 921, 929 (Ind.1998); Bayh v. Sonnenburg, 573 N.E.2d 398, 412 (Ind.1991).
In Sanchez v. State, this Court emphasized that "courts must be careful to avoid substituting their judgment for those of the more politically responsive branches." 749 N.E.2d 509, 516 (Ind.2001). Identifying the phrase "all power is inherent in the people" in Section 1 as a "constitutional directive," we found that it "suggests deference to legislation that does not run afoul of a specific constitutional provision." Id. As we explained in Baldwin v. Reagan: "In our separation of powers democracy, the constitution empowers the legislative branch to make law. For this reason, every statute stands before us clothed with the presumption of constitutionality unless clearly overcome by a contrary showing." 715 N.E.2d 332, 337-38 (Ind.1999) (citations omitted). It is clear that "[the legislature has wide latitude in determining public policy, and we do not substitute our belief as to the wisdom of a particular statute for those of the legislature." State v. Rendleman, 603 N.E2d 1333, 1334 (Ind.1992). "When a statute can be construed to support its constitutionality, such construction must be adopted." Miller v. State, 517 N.E.2d 64, 71 (Ind.1987).
To support their claim that Section 1 is violated, the plaintiffs present the following line of reasoning: (a) that Section 1 encompasses a right to privacy, (b) that such right incorporates a woman's right to an abortion, (c) that a right to abortion is a core constitutional value that is not subject to governmental regulations that material-Ty burden the right; and (d) that the challenged statutory requirements materially burden the right.
As to the plaintiffs' first two points, it is inconceivable to me that our Constitution's framers intended to create a right to abortion. Beginning in 1835, it was a statutory criminal offense to perform an abortion.[1] This statute was in force at the time of the drafting and adoption in 1851 of Indiana's present Constitution including Section 1. In fact, the people of Indiana, through their elected representatives in the Indiana General Assembly, have continued to consider abortion to be a criminal offense for the past 170 years.[2]
*990 There was no discussion at the 1850-51 Constitutional Convention suggesting or implying any intention to nullify, curtail, or limit this statute. Significantly, several cases immediately after the adoption of Section 1 involved appeals following con-viections for violation of the criminal abortion statute, and none of the resulting opinions even hinted at any concern that the statute violated Section 1 or any other provision in the Indiana Constitution. Willey v. State, 52 Ind. 421, 1876 WL 6425 (1876); Adams v. State, 48 Ind. 212, 1874 WL 5864 (1874); Basset v. State, 41 Ind. 303, 1872 WL 5634 (1872); Carter v. State, 2 Ind. 617, 1851 WL 2989 (1851). Clearly, the framers and ratifiers of Section 1 did not intend to recognize a right to abortion, and their intention is of paramount importance.
Furthermore, expansively construing Section 1 to provide abortion rights is directly contrary to two express provisions included in this same Section 1.
First, the text of Section 1 expressly recognizes the inalienable right of "life." Every decision to terminate a pregnancy denies this right to an unborn child. Our present statutory provisions requiring medical information and a slight delay to facilitate thoughtful consideration serve to protect this inalienable right as to fetal life.
Second, in addition to the explicit reference to "life" as an inalienable right in Section 1, the individual rights protected by this section are each also expressly subject to the right and obligation of government to provide for "the peace, safety, and well-being" of its citizens, often referred to as the "police power." The plaintiffs acknowledge that liberty rights under Section 1 are not unlimited, and that such rights "may be intruded upon when there is a valid reason to exercise the police power to do so." Appellants' Brief at 15.
Numerous Indiana cases have emphasized that rights protected by the Indiana Constitution are nevertheless subject to *991 restriction under the police power of the state. See, e.g., Voelker v. Tyndall, 226 Ind. 43, 45-46, 75 N.E.2d 548, 550 (1947) (upholding a statute challenged under Seetion 1 as "a constitutional exercise of the police power of the state"); State Bd. of Barber Exam'rs v. Cloud, 220 Ind. 552, 572-73, 44 N.E.2d 972, 980 (1942) (stating that liberties are protected by the Indiana Bill of Rights "except as they conflict with the police power"); Kirtley v. State, 227 Ind. 175, 179, 84 N.E.2d 712, 714 (1949) (stating that the inalienable personal liberties under our Constitution are "not to be restricted except perhaps by a proper exercise of the police power of the state"); City of Indianapolis v. Clint's Wrecker Serv., Inc., 440 N.E.2d 737, 741-42 (Ind.Ct.App.1982) (recognizing that an enactment that impedes upon the rights of life, liberty, and the pursuit of happiness runs afoul of Article 1, Section 1 "unless it may be sustained as a proper exercise of the police power"); and State ex rel Mavity v. Tyndall, in which this Court emphasized:
Under the police power possessed by every state as a sovereign, the General Assembly was within its rights in enacting the several sections of the questioned statute. In so doing it exercised that full final power involved in the administration of the law as the means to the attainment of practical justice upon which the very existence of government depends, as well as the security of the social order, the life and health of the citizen, the enjoyment of private and social life, and the beneficial use of property.
225 Ind. 360, 366-67, 74 N.E.2d 914, 917 (1947).[3]
In numerous ways, Indiana government presently uses its police power to provide for the health and safety of citizens even though it may involve restrictions upon personal freedom with respect to an individual's own body. For example, drivers are required to wear seat belts, Ind.Code § 9-19-10-2 to -2.5; school children must receive immunizations before attending public school, 410 Ind. Adm.Code § 1-1-1 to -4; persons with HIV or hepatitis are required to warn anyone in danger of contacting such viruses, Ind.Code § 16-41-7-1; physicians suspecting certain diseases must report the patient's name and address to local health officials, 410 Ind. Adm.Code § 1-2.3-47; and individuals are prohibited from possessing dangerous drugs and other substances by our erimi-nal code.
By enacting the pre-abortion, in-person counseling requirement and mandatory eighteen-hour waiting period, our legislature has provided important protections for the safety and well-being of pregnant women contemplating an abortion. A considerable body of research recognizes and explores the fact that a significant number of women who voluntarily terminate pregnancies by abortion may suffer serious harmful psychological consequences, with the onset of such distress often delayed until later in life[4] The reality of such *992 psychological injuries is a strong legislative justification for requiring thoughtful deliberation before undergoing an abortion.[5] The safety and well-being of pregnant women considering abortion are clearly served by legislation assuring they receive vital medical and psychological risk information and have an opportunity to consider the risks before rushing into an irreversible decision that not only will fatally impact fetal life,[6] but also will have a possibly devastating effect upon their own future lives as well. Providing Hoosier women with such relevant risk information enables them to make intelligent choices. But failing to assure dissemination of such information abuses women by depriving them of facts essential to make such decisions.
Our present statutory provisions requiring advisement of medical information and a slight delay to facilitate thoughtful consideration also serve the state's legitimate interest in preserving fetal life. In the exercise of its constitutional responsibility to provide for public welfare, our legislature has explicitly declared Indiana's pub-Tie policy on this issue: "Childbirth is preferred, encouraged, and supported over abortion." Ind.Code § 16-34-1-1.
The plaintiffs acknowledge that individual liberties may be subject to government regulation to assure public safety and well-being. But they seek exclusion from this principle 'on the ground that the alleged right to abortion is a core constitutional value, which cannot be materially burdened. In Price v. State, 622 N.E.2d 954, 960 (Ind.1993), Chief Justice Shepard observed that "in Indiana the police power is limited by the existence of certain preserves of human endeavor, typically denominated as interests not 'within the realm of the police power," upon which the State must tread lightly, if at all." (citations omitted). He then explained: "Put *993 another way, there is within each provision of our Bill of Rights a cluster of essential values which the legislature may qualify but not alienate. A right is impermissibly alienated when the State materially burdens one of the core values which it embodies." Id. (citations omitted).
The majority opinion finds it "apparent that if there is a core constitutional value of privacy implicated [under Article 1, Seetion 1], the purpose for which it is designed is a woman's right to make the ultimate decision to terminate her pregnancy." Opin. at 984. But as noted above,[7] even from before the adoption of Indiana's Constitution in 1851, abortion has been considered a criminal offense under Indiana law. Even if we were to imagine that our framers and ratifiers intended Section 1 to protect some aspect of individual privacy, it is historically and logically unacceptable to suppose that they designed such protection for the purpose of assuring a right to abortion.
To the contrary, as previously discussed, there is strong evidence that the framers and ratifiers did not intend to protect a right to abortion, and certainly they did not consider it a core constitutional value. In its decision reversing the trial court, the Court of Appeals asserted its view that the "inalienable rights" clause of Section 1 was intended for the protection of natural rights, and that among these natural rights is "the decision to terminate pregnancy." Clinic for Women v. Brizzi, 814 N.E.2d 1042, 1048-49 (Ind.Ct.App.2004). But the proposition that a right to abortion is a core value because it is a "natural" right appears self-contradiectory. Becoming pregnant after intercourse is natural. Giving birth to the resulting child is natural. Intentionally terminating a pregnancy is unnatural. Procreation is a natural right. Abortion is not.
I believe that the core values of Section 1 do not include the alleged right to abortion, and thus the state's constitutional responsibility and authority to provide for safety and public welfare in matters related to abortion remain undiminished and are not subject to the Price material burden test.
In addition to the evidence that the creators of Section 1 did not intend to protect a right to abortion, and certainly not as a core constitutional value, consideration of the obvious core values of Section 1 confirm the authority of our legislature to enact the challenged medical advisement and waiting period requirements. Any core values in Section 1 must certainly include the items expressly enumerated: the rights of "life, liberty, and the pursuit of happiness," and the fact that governments are instituted for the "safety and well-being" of its people. By protecting the safety and well-being of pregnant women and discouraging harm to fetal life, the pre-abortion counseling requirement and the mandatory 18-hour waiting period do not burden but rather serve these core values.
Notwithstanding his admonition in Sanchez that "constitutional rights not grounded in a specific constitutional provision should not be readily discovered," 749 N.E.2d at 516, Justice Boehm now urges in his dissent that Section 1 should be expansively construed to provide protection for rights not specifically mentioned in our constitution but related to individual decisions such as whom to marry, whether to have a child, and whether to terminate a pregnancy. But individual liberty in these areas is not absolute and unrestrained. Statutory provisions have long imposed *994 age,[8] consanguinity,[9] multiple spouse,[10] and mental competency [11] restrictions upon eligibility for marriage. And parental rights are subject to restriction and termination by the state when necessary for the health and welfare of affected children.[12]
Justice Boehm's dissent proposes that government should not take sides by enacting legislation regarding matters involving individual conscience and religious belief. But such a proposition could be used to attack the constitutionality of much of our criminal code, particularly laws prohibiting murder, theft, and perjury because these enactments reflect values taught in the Ten Commandments. His argument could likewise be the basis for a challenge to public assistance for the needy, largely an outgrowth of the values of Christian charity, or to legislation seeking racial equality, which resulted substantially from religious movements of the mid-1800s and again in the past fifty years, especially considering the instrumental leadership role of Rev. Dr. Martin Luther King, Jr. and churches and religious adherents galvanized and inspired by his sermons. Legislative enactments should not be invalidated merely because they may foster or coincide with social values deriving from a particular set of religious beliefs or personal convictions.
The opinions of the majority and Justice Boehm disagree on whether the "material burden" test created in Price is essentially equivalent to the "undue burden" or "substantial obstacle" test presented in Planned Parenthood v. Casey, 505 U.S. 833, 876-77, 112 S.Ct. 2791, 2820, 120 L.Ed.2d 674, 714-15 (1992). Because of my firm conviction that the Indiana Constitution does not recognize or protect any right to abortion, these issues regarding how and whether the material burden test applies do not arise and are unnecessary to address.
In conclusion, while disagreeing with the rationale of the majority opinion, I concur with its result in affirming the trial court's dismissal of the plaintiffs' action.[13]

. The 1835 statute, in existence at the time our Constitution was adopted, provided:
[Elvery person who shall wilfully administer to any pregnant woman, any medicine, drug, substance or thing whatever, or shall use or employ any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, shall upon conviction, be punished by imprisonment in the county jail any term of time not exceeding twelve months, and be fined any sum not exceeding 'five hundred dollars.
Ind.Rev.Stat., ch. XXVI, § 3, p. 224 (1838).

. Indiana enacted its first abortion statute on February 7, 1835, only nineteen years after Indiana became a State. See 1835 Ind. Acts ch. XL VII, § 3, in Laws of Indiana 66 (1834- *990 37) (codified at Ind.Rev.Stat. ch. XXVI, § 3, p. 224 (1838), recodified at Ind.Rev.Stat. ch. 53 § 109, pp. 982-83 (1843)). The law underwent further changes in 1852 and 1859. See 1852 Ind. Acts § 36 (codified at Ind.Rev.Stat. Vol. II, part 3, ch. 6, § 36, p. 437 (1852)); 1859 Ind. Acts ch. LXXXI, § 2, p. 131 (codified at Ind. Stat. Vol. II, part 3, ch. VII, § XXXVI, p. 469 (1862), recodified at Davis' Indiana Stat., Vol. II, part. 3, ch. 8, § 36 pp. 471-42 (1876)). In 1881, the law was superseded by an act that raised the penalty from a misdemeanor to a felony and made solicitation of an abortion by the pregnant woman herself a misdemeanor. See 1881 Ind. Acts, ch. 37, §§ 22, 23, p. 177 (codified at Ind.Rev. Stat. ch. 5, art. 2, §§ 1923, 1924, p. 358 (1881), recodified at Ind. Stat. Vol. I, ch. 5, art. 2, §§ 1996, 1997, pp. 791-92 (Burns 1901), recodified at Ind. Stat. ch. 5, art 2, §§ 2010, 2011, p. 207 (Burns Supp.1905)). In 1905, a new criminal code was enacted which essentially restated the prohibitions in the 1881 act. See 1905 Ind. Acts ch. 169, §§ 367-368, pp. 663-64 (codified at Ind. Stat. ch. 5, art. 2, §§ 2256-2257, pp. 1028-29 (Burns 1908), recodified at Ind.Code §§ 35-1-58-1, 35-1-58-2 (1971)). After Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), 'was decided, the legislature amended Indiana's abortion law to permit certain types of abortion. 1973 Ind. Acts, P.L. No. 322 (codified at Ind.Code § 35-1-58.5-1 to -8 (1973)). Sections 35-1-58-1 and 35-1-58-2, however, were not repealed until 1977, see 1977 Ind. Acts, ch. 335, § 21, and in 1976 this Court upheld the conviction of a woman charged with attempting to procure an abortion in violation of section 35-1-58-1. Rhim v. State, 264 Ind. 682, 686, 348 N.E.2d 620, 623 (1976). Even now, Indiana's abortion statute begins by stating "Abortion shall in all instances be a criminal act," but it proceeds to provide limited exceptions authorizing abortions in limited circumstances and generally requiring the woman to file her consent. Ind.Code § 16-34-2-1(B). A succeeding statute specifies the matters to be included in a personal medical advisement and requires a delay of at least eighteen hours before the abortion is performed. Ind.Code -§ 16-34-2-1.1.

. Indiana history further confirms the principle that the individual freedoms to which Article 1 refers are subject to reasonable regulation under the state's police power. Conspicuously absent from our present Constitution, which was adopted in 1851, is a provision in Indiana's first Constitution that provided: "To guard against any encroachments on the rights herein retained, we declare, that every thing in this article, is excepted out of the general powers of government, and shall forever remain inviolable." IND. CONST. of 1816, Art. I, § 24. This limitation was not retained in our present Constitution.

. See, e.g., D. Bagarozzi, Post Traumatic Stress Disorders in Women Following Abortion: Some Considerations and Implications For Marital/Couple Therapy, 1 AM. J. FAM. & MARRIAGE 51-68 (1993); A.N. Broen et al., Psychological Impact on Women of Miscar *992 riage Versus Induced Abortion: A 2-Year Follow-Up Study, 66 PSYCHOSOMATIC MED. 265-71 (2004); J.R. Cougle, D.C. Reardon & P.K. Coleman, Generalized Anxiety Following Unintended Pregnancies Resolved Through Childbirth & Abortion: A Cohort Study of 1995 National Survey of Family Growth, 19(1) J. ANXIETY DISORD. 137-42 (2005); A.C. Gilchrist et al., Termination of Pregnancy and Psychiatric Morbidity, 167 BRIT. J. PSYCHIATRY 243-248 (1995); B. Major et al., Personal Resilience, Cognitive Appraisals, and Coping: An Integrative Model of Adjustment to Abortion, 74 J. PERSONALITY & SOC. PSYCHOL. 735-752 (1988); K. McAll & W.P. Wilson, Ritual Mourning for Unresolved Grief After Abortion, 80(7) SOUTH MED. J. 817-21 (1987); P.G. Ney & AR. Wickett, Mental Health & Abortion: Review & Analysis 14(4) PSYCHIATR. J. UNIV. OTT. 506-16 (1989); D.C. Reardon et al., Psychiatric Admissions of Low-Income Women Following Abortion and Childbirth, 168 CMAJ 1253-56 (2003); J.M. Thorp Jr., KE. Hartmann & E. Shadigian, Long-Term Physical & Psychological Health Consequences of Induced Abortion: A Review of The Evidence, 58(1) OBSTET. GYNECOL. SURV. 67-79 (2003).

. Among the information that must be given to a pregnant woman seeking an abortion, Indiana Code § 16-34-2-1.1(a)(1)(C) requires that a physician or physician's assistant advise the woman of "the risks of ... the procedure." Although it would be preferable for the statute to explicitly include among the required advisements the risks of substantial psychological harm to a woman choosing to have an abortion, the existing language is sufficiently broad to require such information to be provided by physicians. Recognizing that "a woman may suffer long term emotional or psychological injury from making an ill-informed decision to abort a pregnancy," this Court has noted that "[the legislature has attempted to ensure that women receive the best information available."" A Woman's Choice-East Side v. Newman, 671 N.E.2d 104, 111 (Ind.1996).

. In Humphreys v. Clinic for Women, Inc., 796 N.E.2d 247, 257 (Ind.2003), this Court recognized that the government's interest in protecting fetal life is a valid legislative justification and that it is not arbitrary or manifestly unreasonable.

. See supra notes 1-2 and accompanying text.

. See, e.g., Ind.Code §§ 31-1 1-1-4, -5.

. See, e.g., Ind.Code §§ 31-11-1-2, 31-11-8-3.

. See, e.g., Ind.Code §§ 31-11-1-3, 31-11-8-2.

. See, e.g., Ind.Code §§ 31-11-4-11, 31-11-8-4.

. See, e.g., Ind.Code §§ 31-14-13-4; 31-14-14-1; 31-17-2-17, -18; 31-35-2-1 to -8.

. In appealing the trial court's dismissal of their complaint, the plaintiffs contended that the statutory abortion requirements violate three separate provisions of our state constitution: (a) the "inalienable rights" provision, Article 1, Section 1; (b) the "due course of law'"' provision, Article 1, Section 12; and (c) the freedom of speech provision, Article 1, Section 9. The Court of Appeals rejected the latter two claims but reversed on the first. Clinic for Women, Inc., 814 N.E.2d at 1044-45 n. 1, 1053-57. I join the majority opinion in summarily affirming the outcome of the Court of Appeals decision in rejecting the due course of law and free speech claims.