**CLINIC FOR WOMEN, INC., et al., Appellant–Plaintiff,**

v.

**Carl J. BRIZZI, on behalf of a defendant class of all Indiana Prosecuting Attorneys, Appellee–Defendant.**

No. 49A05–0305–CV–259.

Court of Appeals of Indiana.

Sept. 17, 2004.

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN, Simon Heller, Janet Crepps, New York, NY, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Thomas M. Fisher, Special Counsel, Ellen H. Meilaender, Deputy Attorney General, Heather Hagan, Law Clerk, Indianapolis, IN, Attorneys for Appellee.

Eric Allan Koch, The Koch Law Firm, P.C., Bloomington, IN, Paul Benjamin Linton, Northbrook, IL, Attorneys for Amicus Curiae, Members of the Indiana General Assembly.

William J. Wood, Wood, Tuohy, Gleason, Mercer & Herrin, P.C., Indianapolis, IN, Attorneys for Amicus Curiae, Indiana Catholic Conference.

## OPINION

VAIDIK, Judge.

### CASE SUMMARY

Clinic for Women ("the Clinic") appeals the trial court's decision to dismiss its complaint challenging the constitutionality of Indiana Code § 16–34–2–1.1, the statute governing voluntary and informed consent to abortion. We find that article I, § 1 of the Indiana Constitution protects and is animated by privacy as a core constitutional value and that this state constitutional right of privacy extends to all Indiana citizens, including women seeking to obtain an abortion. Thus, we reverse and direct the trial court to reinstate the complaint and to conduct a hearing for the purpose of determining whether the requirements of the informed consent statute impose a material burden on the core constitutional value of privacy. We also find, as a matter of first impression, that article I, § 9 of the Indiana Constitution—the free speech provision—extends to the right to refrain from speaking, i.e. compelled speech, but that the informed consent statute does not unconstitutionally infringe upon this right.[1]

Reversed.

1. The Clinic also presents a cursory one-para- graph "argument" in its brief asserting that

## FACTS AND PROCEDURAL HISTORY[2]

The Clinic, which provides abortions in Indiana, alleges that Indiana Code § 16–34–2–1.1 violates the state constitutional right of privacy of women seeking to obtain abortions and the abortion providers' right to free speech under the Indiana Constitution.[3] Specifically, the Clinic challenges the statutory requirements that women seeking abortions receive in-person counseling at least eighteen hours before obtaining an abortion (the "two trip requirement") and that abortion providers orally convey information specified in the statute to women seeking to obtain an abortion.[4] The Clinic maintains that re-

---

Indiana Code § 16–34–2–1.1 violates article 1, § 12 of the Indiana Constitution, the due course of law provision, because its requirements are not rationally related to a legitimate state interest. But because we find that the Clinic presents a legal conclusion rather than a cognizable argument, we need not reach the due process issue. *See* Ind. Appellate Rule 46(A)(8).

**2.** We heard oral argument in our courtroom on November 20, 2003. We thank counsel for their commendable presentations, which assisted us in the determination of this case.

**3.** This statute was previously challenged on different grounds in *A Woman's Choice–East Side Women's Clinic v. Newman*, 671 N.E.2d 104 (Ind.1996). In that case, the federal district court certified questions about the statute to our supreme court so that it could resolve a facial challenge to the law on federal constitutional grounds. The first question certified was whether the statute excuses compliance when compliance would in any way pose a significant threat to the life or health of the woman. The court determined that the law "contemplates that all relevant factors pertaining to a woman's health can, indeed must, be considered when deciding whether to dispense with the statute's informed consent provisions." *Id.* at 108–09. It explained its belief that these factors would be taken into consideration when the doctor at issue formed his or her "clinical judgment." If the doctor determines, in his or her clinical judgment, that an abortion is medically necessary, then it may be performed without delay. "The references to death or substantial impairment simply focus the physician's clinical judgment on medical necessity rather than lesser and regular conditions normally associated with pregnancy." *Id.* at 109 (footnote omitted). The court determined that the statute granted women protection from risks connected with delay generally, not just eighteen-hour delays. Thus,

the court concluded that a woman could be excepted from compliance with the statutory informed consent provisions when she faces significant and imminent threats to her life or either her physical or mental health. However, severe but temporary conditions in which an abortion is not the medically necessary treatment are not covered by the exception.

**4.** Indiana Code § 16–34–2–1.1 provides:

An abortion shall not be performed except with the voluntary and informed consent of the pregnant woman upon whom the abortion is to be performed. Except in the case of a medical emergency, consent to an abortion is voluntary and informed only if the following conditions are met:
(1) At least eighteen (18) hours before the abortion and in the presence of the pregnant woman, the physician who is to perform the abortion, the referring physician or a physician assistant (as defined in IC 25–27.5–2–10), an advanced practice nurse (as defined in IC 25–23–1–1(b)), or a midwife (as defined in IC 34–18–2–19) to whom the responsibility has been delegated by the physician who is to perform the abortion or the referring physician has orally informed the pregnant woman of the following:
(A) The name of the physician performing the abortion.
(B) The nature of the proposed procedure or treatment.
(C) The risks of and alternatives to the procedure or treatment.
(D) The probable gestational age of the fetus, including an offer to provide:
(i) a picture or drawing of a fetus;
(ii) the dimensions of a fetus; and
(iii) relevant information on the potential survival of an unborn fetus; at this stage of development.
(E) The medical risks associated with carrying the fetus to term.
(2) At least eighteen (18) hours before the abortion, the pregnant woman will be orally informed of the following:

quiring women to make two trips to the abortion provider at least eighteen hours apart—the first for counseling and the second for the procedure—may effectively prevent women who live in rural areas of Indiana from obtaining abortions because of the distance they must travel to gain access to an abortion provider.

The Clinic filed a complaint in February 2003, seeking to enjoin enforcement of the statute on the ground that it violates the Indiana Constitution. In April 2003, the State filed a motion to dismiss the Clinic's complaint for failure to state a claim. Following a hearing, the trial court granted the State's motion, and the Clinic appealed to this Court.

## DISCUSSION AND DECISION

At the outset we note that this case is before us on appeal from the trial court's dismissal of the Clinic's complaint pursuant to Indiana Trial Rule 12(B)(6). In reviewing the grant of a motion to dismiss pursuant to Trial Rule 12(B)(6), our standard of review is well settled. *Lawson v. First Union Mortgage Co.*, 786 N.E.2d 279, 281 (Ind.Ct.App.2003). A 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests the legal sufficiency of a claim, not the facts supporting it. *Id.* Therefore, we view the complaint in the light most favorable to the non-moving party, drawing every reasonable inference in favor of that party. *Id.* In reviewing a ruling on a motion to dismiss, we stand in the shoes of the trial court and must determine if the

trial court erred in its application of the law. *Id.* The trial court's grant of the motion to dismiss is proper if it is apparent that the facts alleged in the complaint are incapable of supporting relief under any set of circumstances. *Id.* Furthermore, in determining whether any facts will support the claim, we look only to the complaint and may not resort to any other evidence in the record. *Id.*

## I. Right of Privacy

██ The Clinic challenges the constitutionality of Indiana Code § 16–34–2–1.1, asserting that the statute's "two trip requirement"—resulting from the combination of an in-person counseling requirement and a mandatory 18–hour waiting period—imposes a material burden on the state constitutional right of privacy of women seeking to obtain abortions. The State denies that the Indiana Constitution protects a right of privacy; the State argues alternatively that even if such a state constitutional right does exist, the challenged statute does not unconstitutionally violate that right. We begin our analysis with an overview of privacy in Indiana and then discuss privacy as a core constitutional value animating article I, § 1 of the Indiana Constitution, which provides:

WE DECLARE, That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the People; and that all free governments are, and of right ought to be, founded on their au-

(A) That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care from the county office of family and children.

(B) That the father of the unborn fetus is legally required to assist in the support of the child. In the case of rape, the information required under this clause may be omitted.

(C) That adoption alternatives are available and that adoptive parents may legally pay the costs of prenatal care, childbirth, and neonatal care.

(3) The pregnant woman certifies in writing, before the abortion is performed, that the information required by subdivisions (1) and (2) has been provided.

thority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the People have, at all times, an indefeasible right to alter and reform their government. We find that privacy not only animates article I, § 1, but permeates the atmosphere created by our constitution and extends to all our citizens, including women seeking to exercise their right to obtain an abortion.

## A. Privacy in Indiana

"[Indiana] was born in conflict, in individualism. It would seem to follow that the constitution's key values are not civility, equality, tranquility, or order, but liberty, opportunity, vigor, and privacy." Patrick Baude, *Has the Indiana Constitution Found its Epic?* 69 Ind. L.J. 849, 854 (1994). Privacy is not only a core value within the Indiana Constitution but permeates the atmosphere created by our constitution. In addition to article I, § 1, privacy underlies a number of other rights guaranteed by provisions in our Bill of Rights. These include the protections provided for the natural right to worship, Ind. Const. art. I, § 2; freedom of religious opinions and rights of conscience in Ind. Const. art. I, § 3; freedom of religion, Ind. Const. art. I, § 4; the rights to free thought and speech, Ind. Const. art. I, § 9; freedom from unreasonable search or seizure, Ind. Const. art. I, § 11; freedom of emigration, Ind. Const. art. I, § 36; and numerous other rights enumerated in the Indiana Constitution.

Our courts have at least implicitly assumed in previous cases that the right to privacy is embodied in the Indiana Constitution. In *Matter of Lawrance*, 579 N.E.2d 32, 38–39 (Ind.1991), our supreme court was asked to decide whether a person in a persistent vegetative state could be removed from artificial nutrition and hydration. In discussing the parameters of the right to make health care decisions, the court stated: " 'Every human being of adult years and sound mind has a right to determine what shall be done with his own body.' " *Id.* (quoting *Schloendorff v. Soc'y of New York Hosp.*, 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914), *overruled on other grounds* ). The court then cited § 1 and noted:

> This common law has evolved in a legal culture governed by the Indiana Constitution, which begins by declaring that the liberty of our citizens is inalienable. The debates of our constitutional convention suggest that those who wrote the constitution believed that liberty included the opportunity to manage one's own life except in those areas yielded up to the body politic.

*Id.* at 39 (citing Ind. Const. art. I, § 1) (footnote omitted).

In *State ex rel. Mavity v. Tyndall,* our supreme court held that citizens of Indiana have a right to privacy and protection guaranteed by article I, § 21 of the Indiana Constitution, which provides that no services or property may be taken without just compensation. *Mavity,* 225 Ind. 360, 365, 74 N.E.2d 914, 916 (1947); *see also Voelker v. Tyndall,* 226 Ind. 43, 44–45, 75 N.E.2d 548, 549 (1947) (stating, in a case involving a police department's retention of fingerprints, that the right of privacy is a "well-established doctrine, derived from natural law and guaranteed by both the Federal and State Constitutions"). Our supreme court has also held that the individual's right to engage in a lawful business, to determine the price of his or her labor, and to fix his or her business hours, except as they conflict with the police power, are personal privileges and liberties within the protection of the Indiana Bill of Rights. *State Bd. of Barber Exam'rs v. Cloud,* 220 Ind. 552, 572–

73, 44 N.E.2d 972, 980 (1942); *see also Kirtley v. State*, 227 Ind. 175, 179, 84 N.E.2d 712, 714 (1949) (interpreting right created by art. I, § 1); *City of Indianapolis v. Clint's Wrecker Serv., Inc.*, 440 N.E.2d 737, 741–42 (Ind.Ct.App.1982) (considering whether statute violated art. I, § 1). And in *Meury v. Eagle–Union Cmty. Sch. Corp.*, this Court held that the plaintiffs had failed to show "the necessary predicate to a violation" of their state constitutional privacy rights, not that such rights did not exist. *Meury*, 714 N.E.2d 233, 242 (Ind.Ct.App.1999), *trans. denied.* We referred in that case to a "state constitutional tort for invasion of privacy." *Id.*

In countless other arenas, we have recognized that Indiana citizens are justified in their belief that some matters are not subject to involuntary public display. For example, we found an "employee evaluation" exception to Indiana's Open Door law to "permit[ ] employee evaluations to take place in private session [and] prevent[ ] the employee from experiencing public embarrassment related to the critique of his or her work performance and avoid[ ] needless injury to the employee's reputation." *Baker v. Town of Middlebury*, 753 N.E.2d 67, 72–73 (Ind.Ct.App.2001), *trans. denied.* We have also recognized that Hoosiers have a right to privacy with regard to their jury service and deliberations, *see Williams v. State*, 793 N.E.2d 1019, 1032 (Ind.2003), *reh'g denied;* their telephone conversations, *see Henson v. State*, 790 N.E.2d 524, 534 (Ind.Ct.App.2003), *trans. denied;* and their marital communications, *see Overstreet v. State*, 783 N.E.2d 1140, 1155 (Ind.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 1145, 157 L.Ed.2d 1044 (2004). In addition, Indiana common law tort doctrine embraces the principle that privacy is a cognizable interest. *See Creel v. I.C.E. & Assocs., Inc.*, 771 N.E.2d 1276, 1280 (Ind.Ct.App.2002) (recognizing torts of invasion of privacy by intrusion and

public disclosure of private facts), *reh'g denied.* These privacy interests did not spring up in a vacuum but in the atmosphere created by the Indiana Constitution.

Further, this privacy right underlies certain acts of our legislature, including Indiana Code § 16–36–4–8, which allows mentally competent adults to execute a life-prolonging-procedures will declaration, and laws relating to voting, which recognize that Hoosiers are entitled to privacy with regard to the exercise of their voting rights. *See* Ind.Code § 3–11–10–28 (requiring same degree of privacy be given to absentee voters as enjoyed by voters at polling places); I.C. § 3–11–15–13.3 (requiring same degree of privacy be given to blind and visually impaired voters as enjoyed by other voters). The right to privacy is also recognized in Indiana Code § 5–14–3–4, which provides numerous exceptions to the public disclosure requirements for governmental records for personnel files of public employees, test scores of examinees, diaries, journals, personal notes, medical records, and identifying information about library patrons and customers of public utilities, among others. Indiana Code § 35–46–1–15.1 even criminalizes actions regarded as an "invasion of privacy."

We recognize that the right to privacy has never been explicitly stated as one of constitutional dimension. Therefore, we make explicit what heretofore has been implicit: The citizens of Indiana have a fundamental right of privacy inherent in and protected by our state constitution. While we need not decide today precisely what the right to privacy—or the substantive content of article I, § 1, animated by the core value of privacy—encompasses, we have no doubt that it extends to the right to make decisions about our health and the integrity of our minds and bodies.

At the extremes of life, this right includes the right to make decisions about procreation and about the cessation of life-sustaining devices and treatments. Included within the protection of the right to make decisions about our healthcare and the integrity of our minds and bodies is the decision to terminate pregnancy.

## B. Privacy as a Core Constitutional Value Animating Article I, § 1

 When a claimant alleges that a state action violates a constitutional right guaranteed by a provision of the Indiana Constitution, we look to the analysis set forth by our supreme court in Price v. State, 622 N.E.2d 954 (Ind.1993), reh'g denied. As explained by the Price court: "[T]here is within each provision of our Bill of Rights a cluster of essential values which the legislature may qualify but not alienate. A right is impermissibly alienated when the State materially burdens one of the core values which it embodies." Id. at 960. The court then explained that determining which core values animate a particular guarantee is a judicial question; in deciding it, a reviewing court must look to the purpose for which the guarantee was adopted and the history of Indiana's constitutional scheme. Id. at 961; see also City Chapel Evangelical Free, Inc. v. City of South Bend ex rel. Dep't of Redev., 744 N.E.2d 443, 446 (Ind.2001) (applying this analysis to claim that statute violated guarantee of freedom of religion in Indiana Constitution).

Looking to the history of Indiana's constitutional scheme and the purpose of article I, § 1, we hold that privacy is a core constitutional value embodied by this provision. As stated in The Indiana State Constitution: A Reference Guide:

The inalienable rights protected or guaranteed here [in article I, § 1] are those rights and liberties inherent in a sense of democracy that derives from the independence of the individual and a concept of natural individual rights that form the basis for political sovereignty and self-government. Thus, life, liberty, and the pursuit of happiness are the categories of rights specified in this section. The specific, substantive content of these involves a variety of liberties ranging from privacy to procreation, travel to holding office, entering into contracts to practicing religion, and engaging in business practices to voting.

William P. McLauchlan, The Indiana State Constitution: A Reference Guide 33 (1996).

The scope of article I, § 1 has been of interest to judges since the unveiling of the 1851 Constitution. In 1856, Justice Perkins of the supreme court considered the provision in the light of history. Madison & Indianapolis R.R. v. Whiteneck, 8 Ind. 217 (1856). Justice Perkins contrasted the tyranny of governments administered upon the principle that the people were utterly destitute of all rights—governments actuated by "a restless desire of governing too much"—with the type of government that people who came to this country put in place in order to emancipate themselves from such tyranny and to safeguard their natural rights:

Such was the object and intention of the framers of our constitution, in regard to natural rights. They designed the first section of it as a fundamental provision, binding up the supreme power. It was necessarily general. They could not look down the stream of time and see all the cases wherein it would be proper for a state government to exert legislative power, specify them and exclude all others, thus protecting the rights reserved; nor could they anticipate all the various attempts that might be made to invalidate these rights, and expressly prohibit them. They did specifically prohibit

such as they had experienced. But naming such attempts did not exclude the prohibition of others by the general ·fundamental provision. Further, we may say that these restraints were intended to operate upon the legislative power, though we suppose that this will not be denied.... We come to the conclusion, then, that the courts should declare void a law in violation of this fundamental principle of the constitution—a law in violation of the natural rights of man.

*Id.* at 227–29. We are fully persuaded that the right of personal privacy is just such a natural right, a necessary correlate of the guarantees of life, liberty, and the pursuit of happiness explicitly protected by article I, § 1.

In addition to Justice Perkins' consideration of the provision in 1856, various remarks made by delegates at the 1850 Constitutional Convention confirm that the protection of natural rights was foremost in the minds of the framers of our state constitution when they considered article I, § 1. *See* 1 *Debates in Indiana Convention* 952–974 (1850). As Delegate Rariden stated,

> A decent respect for the opinions of the world makes it our duty that we should tell mankind that we have changed the whole theory of civil government. We start out upon the theory, that all power is in the people; that the people have capacity for self-government—that they have innate rights, and there is a natural equality of rights....

*Id.* at 955. Further, Delegate Gordon opined, "The only natural equality among men is an equality of rights; and in this respect all men are equal. The strong have no more natural rights than the weak; the wise than the unwise; the rich than the poor; the white man than the black." *Id.* at 967. And Delegate Smith inquired, "Have we not equally the right to ... pursue happiness, the right to enjoy it, and the right to obtain it?" *Id.* at 968.

Although the substantive, judicially enforceable rights of this provision have historically been acknowledged primarily in the context of economic rights, Indiana Supreme Court decisions have demonstrated that the provision is not so limited. *See, e.g., Matter of Lawrance,* 579 N.E.2d at 39. (citing article I, § 1 as the source of inalienable liberty, which includes "the opportunity to manage one's own life except in those areas yielded up to the body politic"); *Voelker v. Tyndall,* 75 N.E.2d at 549 (stating, in a case involving a police department's retention of fingerprints, that the right of privacy is a "well-established doctrine, derived from natural law and guaranteed by both the Federal and State Constitutions"). Given today's holding, the court considering the Clinic's constitutional challenge to Indiana Code § 16–34–2–1.1 must determine whether the statute imposes a "material burden" on the right of privacy enshrined in article I, § 1. As explained in *Price,* a restriction amounts to a "material burden" upon a core value if the right, as impaired, would no longer serve the purpose for which it was designed. *Price,* 622 N.E.2d at 960 n. 7.[5]

## II. Does the "Two Trip Requirement" Materially Burden Privacy?

█ The statute's "two trip requirement" results from the combination of an in-person counseling requirement and a mandatory 18–hour waiting period—requirements that, as noted by Judge Baker,

---

**5.** In this instance, then, a material burden on women's access to abortion is equivalent to a material burden on the core constitutional value of privacy underlying their right to obtain abortions.

exist for no other medical procedure in Indiana. Because a woman seeking to obtain an abortion has a constitutionally-protected right of privacy, the court considering the constitutionality of the statute must determine whether its two trip requirement materially burdens that right. As stated by the *Price* court, "material burden" analysis, unlike a rationality inquiry, looks only to the magnitude of the impairment: "If the right, as impaired, would no longer serve the purpose for which it was designed, it has been materially impaired." *Price,* 622 N.E.2d at 969 n. 7.

The United States Supreme Court considered a statute with a similar waiting period requirement—but not an in-person counseling requirement—in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). In *Casey,* the plaintiffs challenged a Pennsylvania law that required a woman seeking an abortion to receive counseling at least twenty-four hours before the abortion is performed, arguing that the law violated the United States Constitution. The court reaffirmed the essential holding of *Roe v. Wade* that the decision to terminate a pregnancy is within a woman's liberty interest but stated that this right is not unlimited and that the State may limit or circumscribe this right. *See Casey,* 505 U.S. at 845–46, 112 S.Ct. 2791; *Roe,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The *Casey* court determined that "[o]nly where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." 505 U.S. at 874, 112 S.Ct. 2791.

Ultimately, the court concluded that the twenty-four hour waiting period did not impose an undue burden on a woman's right to terminate a pregnancy. *Id.* at 887, 112 S.Ct. 2791.

Given today's recognition of a right of privacy protected by the Indiana Constitution, this Court is unwilling to agree that the 18–hour waiting period does *not* impose a material burden—our state standard—on the core constitutional value of privacy simply because a 24–hour waiting period was upheld in *Casey.* We find that it cannot be determined from the face of the complaint whether the mandatory delay imposes such a burden. Dismissal therefore was inappropriate. Instead, further proceedings are necessary in order to permit the Clinic an opportunity to present evidence.

Evidence presented in cases in which waiting periods are struck down reveals that there are myriad practical difficulties and health risks associated with mandatory delays;[6] conversely, there appears to be scant evidence that an externally-imposed waiting period actually leads to further reflection or soul-searching on the part of the woman seeking to obtain an abortion. For instance, one state court that struck down, post-*Casey,* a waiting period requirement as a violation of the state constitutional right of privacy wrote: "Studies ... suggest that a large majority of women who have endured waiting periods prior to obtaining an abortion have suffered increased stress, nausea, and physical discomfort, but very few have reported any benefit from having to wait." *Planned Parenthood of Middle Tennessee v. Sundquist,* 38 S.W.3d 1, 23–24 (Tenn. 2000).[7]

---

**6.** In their complaint, Appellants present an extensive list of "Factual Allegations" pertaining to the potential physical and psychological harm and additional costs and barriers created by the statute's two-trip and in-person requirements.

**7.** In the early 1980s—even before the United States Supreme Court decided *City of Akron v.*

Moreover, we are also troubled by the implicit assumption underlying a waiting period requirement in the abortion context. As discussed by Justice Stevens, who concurred in part and dissented in part from the *Casey* opinion:

> The 24–hour waiting period ... arguably furthers the Commonwealth's interests in two ways, neither of which is constitutionally permissible. First, it may be argued that the 24–hour delay is justified by the mere fact that it is likely to reduce the number of abortions, thus furthering the Commonwealths interest in potential life. But such an argument would justify any form of coercion that placed an obstacle in the woman's path. The Commonwealth cannot further its interests by simply wearing down the ability of the pregnant woman to exercise her constitutional right. Second, it can more reasonably be argued that the 24–hour delay furthers the Commonwealths interest in ensuring that the woman's decision is informed and thoughtful. But there is no evidence that the mandated delay benefits women or that it is necessary to enable the physician to convey any relevant information to the patient. The mandatory delay thus appears to rest on outmoded and unacceptable assumptions about the decisionmaking capacity of women.... Part of the constitutional liberty to choose is the equal dignity to which each of us is entitled. A woman who decides to terminate her pregnancy is entitled to the same respect as a woman who decides to carry the fetus to term. The mandatory waiting period denies women that equal respect.

*Casey,* 505 U.S. at 918, 112 S.Ct. 2791 (Stevens, J., concurring in part and dissenting in part).

The Clinic should be allowed an opportunity to present evidence on the nature and severity of the burden imposed by the statute's waiting period and in-person counseling requirements. Moreover, the requirements should not be considered separately, as it is the imposition of the two in tandem that appears so burdensome. Under the informed consent statute here at issue, a woman seeking an abortion must receive in-person counseling *and* she must do so at least eighteen hours before the procedure is performed; thus, while either requirement standing alone may pass constitutional muster, that is not the procedure mandated by the legislation. Because it is plausible that the two trip requirement of Indiana Code § 16–34–2–1.1 could be found to impose a material burden on the core constitutional value of privacy, the trial court erred in granting the motion to dismiss. We therefore direct the trial court to reinstate the complaint and conduct an evidentiary hearing on this issue.

*Akron Center for Reproductive Health,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), which struck down a waiting period requirement as unconstitutional—a number of courts found waiting period requirements unconstitutional. As one court wrote in 1981, "Waiting period requirements have proven a popular form of abortion regulation in recent years, and while the Supreme Court has yet to pass on their validity they have generated a proliferation of lower court decisions. These courts have divided, with a majority holding such a requirement unconstitutional."

*Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1014 (1st Cir.1981); *see, e.g., Charles v. Carey,* 627 F.2d 772, 785–86 (7th Cir.1980) (24–hour waiting period); *Wolfe v. Stumbo,* 519 F.Supp. 22, 24–26 (W.D.Ky.1980) (24 hours); *Margaret S. v. Edwards,* 488 F.Supp. 181, 212–13 (E.D.La. 1980) (24 hours); *Leigh v. Olson,* 497 F.Supp. 1340, 1347–48 (D.N.D.1980) (48 hours); *Women's Cmty. Health Ctr. v. Cohen,* 477 F.Supp. 542, 550–51 (D.Me.1979) (48 hours). It is not clear whether some or all of these cases have been implicitly reversed by *Casey.*

### III. Freedom of Speech

■ The Clinic also asserts that the informed consent statute violates its state constitutional right to freedom of speech by "compel[ling] physicians to state and women to hear the State's message as a condition of the provision and receipt of abortion services." Appellant's Br. p. 20. This presents a question of first impression in Indiana: Does the right to freedom of speech protected by article I, § 9 of the Indiana Constitution extend to the right to refrain from speaking, i.e. compelled speech? We hold that it does, but we find that the informed consent statute at issue in this case does not unconstitutionally infringe upon this right.

■ The state constitutional right to freedom of speech is protected by article I, § 9 of the Indiana Constitution, which provides:

> No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible.

Our supreme court has explained that § 9 contemplates a broad notion of expressive activity and extends to all subjects and every conceivable mode of expression and includes the projection of any words in any manner. *Whittington v. State,* 669 N.E.2d 1363, 1368 (Ind.1999). The Clinic asserts that "expressive activity can be restricted both by compelling speech and by punishing speech once it is made." Appellant's Br. p. 22. The State, however, argues that § 9 is not implicated because the statute does not restrain the free interchange of thought and opinion or restrict the right of any person to speak.

The United States Supreme Court has stated unequivocally that just as the First Amendment to the United States Constitution may prevent the government from prohibiting speech, the First Amendment may also prevent the government from compelling individuals to express certain views. *United States v. United Foods, Inc.,* 533 U.S. 405, 410, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001). "There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 796–97, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (Court's emphasis in original); *see also Wooley v. Maynard,* 430 U.S. 705, 715–16, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).

As Indiana's Chief Justice Shepard has observed, the language of § 9 "affirms the rights of expression in language much more comprehensive than the First Amendment." Randall T. Shepard, *Second Wind for the Indiana Bill of Rights,* 22 Ind. L.Rev. 575, 580–81 (1989). Given the expansive language of § 9 and our supreme court's recognition of a "broad notion of expressive activity," *see Whittington,* 669 N.E.2d at 1367, we see no reason why article I, § 9 should not extend—like the First Amendment—to the right *not* to speak. The freedom to express oneself surely extends with equal force to the right to be free from compelled speech. We therefore hold that article I, § 9 of the Indiana Constitution protects against both compelled silence and compelled speech.

■ We must next determine whether Indiana Code § 16–34–2–1.1, which mandates that abortion providers orally convey specified information to women seeking to obtain an abortion, violates the abortion providers' state constitutional

right to freedom of speech.[8] In making this determination, we note that statutes are presumptively constitutional until clearly proven otherwise. *Clint's Wrecker Serv., Inc.,* 440 N.E.2d at 740. The burden of overcoming the presumption is on the challenger, and all doubts must be resolved against him. *Id.*

Here, in support of its contention that the informed consent statute violates the abortion providers' right not to speak, the Clinic advances two arguments. First, the Clinic asserts that the Indiana Legislature lacks the authority to order abortion providers to provide mandatory information unless there is a showing "of the need to compel the speech . . . to avoid abuse." Appellant's Br. p. 22. Second, the Clinic asserts that the speech compelled by the informed consent statute materially burdens the core constitutional value of political/ideological speech. We consider each argument in turn.

### A. Abuse in the Context of Compelled Speech

First, the Clinic asserts that the Legislature cannot compel abortion providers to communicate certain information unless that information is required to prevent abuse. Abuse "lies in that expression which injures the retained rights of individuals or undermines the State's efforts to facilitate their enjoyment." *Price,* 622 N.E.2d at 959. In *Price,* the court stated that it was unconstitutional to sanction pure political speech unless the speech inflicted harm similar to that required under

tort law upon determinable parties. *Id.* at 964.

Here, the Clinic argues that the State has the burden of proving that an "abuse" would occur if the informed consent information was withheld from the woman seeking an abortion. The Clinic argues:

> In the compelled speech situation the "abuse" portion of article I, § 9 must mean that speech can be properly compelled if failure to speak would lead to abuse. . . . Therefore, absent some showing of the need to compel the speech here to avoid abuse, it is beyond the authority of the Indiana Legislature to compel abortion providers to provide mandated information.

Appellant's Br. p. 22. We cannot agree with the Clinic's interpretive application of "abuse" analysis in the context of compelled speech.

According to *Price,* a claimant challenging the constitutionality of an application of the disorderly conduct statute "retains the burden of proving that the State could not reasonably conclude that the restricted expression was an 'abuse.'" *See Whittington,* 669 N.E.2d at 1369. Nonetheless, there is no affirmative burden on the part of the State to prove that the enactment of a challenged statute was necessary to remedy an "abuse" that would occur in the absence of the statute. Indeed, statutes are presumptively constitutional until clearly proven otherwise by the challenger. *See Clint's Wrecker Serv., Inc.,* 440 N.E.2d at 740. In determining

---

8. Analyzing the constitutionality of a statute under § 9 requires a significantly different approach than that employed under the First Amendment. *See* Daniel O. Conkle, *The Indiana Supreme Court's Emerging Free Speech Doctrine,* 69 Ind. L.J. 857 (1994). Most notably, § 9 analysis does not involve a balancing test of the competing interests of the government and the person challenging the legislation. *See Wooley,* 430 U.S. at 705, 97 S.Ct. 1428 (holding that the government's asserted interests were not sufficiently compelling to outweigh the First Amendment interest at stake). As stated by our supreme court, "[T]he trigger of the right to speak clause is the notion of restriction. In construing that important concept, we resist the siren song of First Amendment jurisprudence." *Whittington,* 669 N.E.2d at 1368.

the constitutionality of a statute, this Court looks only to the legislative act itself, limiting ourselves "to the narrow role of determining whether challenged state action has some reasonable relation to or tendency to promote the state's legitimate interests." *Whittington*, 669 N.E.2d at 1369; *see also Hanley v. State*, 234 Ind. 326, 334, 123 N.E.2d 452, 454 (1954) (stating that if a legislative act is properly challenged, "it then becomes the duty of the courts to review such legislation and determine whether it relates to and is appropriate to secure the object in view"), *reh'g denied*. Thus, we reject the Clinic's argument that because the State did not demonstrate that the absence of the statute would amount to an abuse the informed consent statute is unconstitutional.

## B. Police Power and Core Constitutional Values

■ Next the Clinic asserts that the speech compelled by the informed consent statute materially burdens the core constitutional value of political/ideological speech. We disagree, finding that the content of the speech in question does not implicate a core constitutional value; instead, the statute's requirement that abortion providers orally convey specified information to women seeking to obtain an abortion is a reasonable exercise of the state's police power.

■ Interpretation of the Indiana Constitution is controlled by the text itself, illuminated by history and by the purpose and structure of our constitution and the case law surrounding it. *Price*, 622 N.E.2d at 957. Our supreme court, in *Price v. State*, set forth the following historical analysis of our Constitution:

> [The] design reflects the influence of the natural rights paradigm ascendant during Indiana's formative years. Under that theory, individuals are deemed to have ceded a quantum of their "natural" rights in exchange for "receiving the advantages of mutual commerce." The aggregate of these concessions, often called the state's police power, constitutes the authority by which the advantages of political community are secured. Viewed in this light, police power is properly understood as the right of individuals, collectively, to ensure and promote the order, safety, health, morals and general welfare of the community.

*Price*, 622 N.E.2d at 958–59 (internal citations omitted). Thus, the *Price* court recognized a state police power, which the state may exercise to promote the health, safety, comfort, morals, and welfare of the public. *Id.* Courts typically defer to legislative decisions about when to exercise the police power and require only that they be rational. *Id.* "[W]e must accord 'considerable deference' to the judgment of the legislature, inasmuch as the decision as to what constitutes a public purpose is first and foremost a legislative one." *Whittington*, 669 N.E.2d at 1369. "We [limit] ourselves to the narrow role of determining whether challenged state action has some reasonable relation to or tendency to promote the state's legitimate interests." *Id.*

The *Price* court, however, also recognized another aspect of this constitutional arrangement: "interests not 'within the realm of the police power.'" *Price*, 622 N.E.2d at 960 (citing *Milharcic v. Metro. Bd. of Zoning Appeals*, 489 N.E.2d 634, 637 (Ind.Ct.App.1986)).

> [T]here is within each provision of our Bill of Rights a cluster of essential values which the legislature may qualify but not alienate. A right is impermissibly alienated when the State materially burdens one of the core values which it embodies. Accordingly, while violating a rational statute will generally constitute abuse under § 9, the State may not

punish expression when doing so would impose a material burden upon a core constitutional value.

*Id.* (internal citations omitted). In *Price,* the court ultimately concluded that the speech under scrutiny in that case was "pure political speech"—a core constitutional value enshrined in § 9—and the application of the disorderly conduct conviction imposed a material burden on the free exercise of free speech. *Id.* at 964–65.

Since *Price,* § 9 challenges to restrictions on free speech have been directed exclusively to the application of the disorderly conduct statute. *See, e.g., Whittington,* 669 N.E.2d 1363; *Radford v. State,* 640 N.E.2d 90 (Ind.Ct.App.1994), *trans. denied.* And our supreme court has not yet recognized any other category of speech within the § 9 core value cluster except for political speech. *See id.* Thus, claimants generally attempt to persuade the court that their speech is pure political speech so as to invoke the protections accorded this category of speech. If a claimant can show that his or her expressive activity was political, then the burden shifts to the State to demonstrate that its action has not materially burdened the claimant's opportunity to engage in free expression. *Whittington,* 669 N.E.2d at 1369.

As a general matter, we find the Clinic's reliance on *Price's* core constitutional value analysis in this instance to be misplaced. Because the expression at issue is not political speech, a *Price* material burden analysis is inappropriate.[9]

Instead, the speech requirement of the informed consent statute falls within the regulatory ambit of the state's police power and, as such, must satisfy only a rationality or reasonableness review. This Court has adopted the following two-step analysis for determining the constitutionality of a legislative act against the permissible bounds of the police power:

> First, does it tend to promote the health, peace, morals, education, good order and welfare of the people? More specifically, does it tend to correct some evil or promote some interest of the state? If the answer is yes, the wisdom, necessity and policy of the law are solely within the jurisdiction of the legislature. The second inquiry, more narrow, but equally important, is whether the particular statute under scrutiny bears a reasonable and substantial relation to accomplishing the purpose established in step one.

*Clint's Wrecker Serv., Inc.,* 440 N.E.2d at 742 (quoting *Crane Towing, Inc. v. Gorton,* 89 Wash.2d 161, 570 P.2d 428, 433 (1977)); *see also Bruck v. State ex rel. Money,* 228 Ind. 189, 91 N.E.2d 349, 353 (1950) ("Our courts have consistently held that the methods or means used to protect public order, health, morals, safety or welfare

9. The Clinic argues "the challenged statute compels the providers to provide the government's message espousing social policy favoring childbirth over abortion, in effect forcing them to engage in political speech with which they may not agree." Appellant's Reply Br. p. 16–17. First, we disagree with the contention that the language of the informed consent statute is "political speech," as it does not "comment on government action, whether applauding an old policy or proposing a new one, or opposing a candidate for office or criticizing the conduct of an official acting under color of law," and we decline the Clinic's invitation to expand that definition to include "ideological" speech. *Whittington,* 669 N.E.2d at 1370. Second, the proper inquiry here is whether the right to refrain from conveying the information contained in the statute implicates a core constitutional value; because we find that the speech is not political, we need not decide whether the right to refrain from making political speech would itself be deserving of the same heightened protection.

must have some reasonable relation to the end in view.").

The statute's speech requirement does tend to promote the health and welfare of women seeking to obtain an abortion, which is a legitimate state interest, by advising women of the risks of the procedure. Moreover, requiring abortion providers among other things to orally convey the information contained in the informed consent statute to women seeking to obtain an abortion undoubtedly bears a reasonable and substantial relation to the purpose of promoting the health, safety, and welfare of such women. Appellee's Br. p. 46. Indeed, informed consent statutes exist in many areas of medical care in addition to abortion.[10] *See, e.g.*, Ind.Code § 16–28–14–2 (immunizations); Ind.Code § 16–41–6–2 (court-ordered tests for communicable diseases); Ind.Code § 16–41–12–15 (blood donation); Ind.Code § 16–41–14–13 (semen donation); Ind.Code § 34–18–12–3 (generally). Although the informed consent statute at issue in this case differs somewhat from general informed consent statutes that exist for other procedures, we find that the statute nonetheless falls within the regulatory ambit of the State's police power and has some reasonable relation to or tendency to promote the State's legitimate interest in promoting the health, safety, and welfare of women seeking to obtain an abortion.[11] Accordingly, we reject the Clinic's contention that the statute unconstitutionally infringes on the abortion providers' right to free speech.

Reversed.

KIRSCH, C.J., concurs.

BAKER, J., concurs in part and dissents in part with separate opinion.

BAKER, Judge, concurring in part and dissenting in part.

The law is dialectic in a deeper sense than its adversary process. It mediates most significantly between right and right." [1] Today we are charged with precisely this type of mediation—the woman's right to an abortion and the government's right to regulate the same. I fully concur with Part III of the majority's opinion. However, I must dissent from the majority's determination that a right to privacy may be found in Article I, section 1 of the Indiana Constitution. I further disagree that the question of whether the eighteen-hour and in-person requirements are a material burden is a question of fact that should be remanded to the trial court. Because I believe that these requirements are facially discriminatory and not rationally related to a legitimate state goal, I

---

10. And of course the regulatory ambit of the State's police power is not limited to health care. For instance, Indiana Code § 22–2–2–8 requires employers subject to the minimum wage law to post a copy of the wage regulations in a conspicuous place in the area where employees are employed. Indiana Code § 15–5–13–6 requires the labels of commercial livestock feed to contain certain information, while Indiana Code § 16–42–2–1 requires the designation of optional ingredients be named on food labels where required by the state department. Also, Indiana Code § 24–4.5–3–301 requires the disclosure by lenders of consumer loans to borrowers, to name a few examples.

11. We agree with the Clinic that there is an ideological component to the informed consent statute, sections (1)(D) and (2) in particular. But we find that the statute nonetheless bears a rational relation to the State's interest.

1. Paul Freund, "Legal Frameworks for Human Experimentation," in *Experimentation with Human Subjects* 105 (Paul Freund, ed.1969), quoted in Roger B. Dworkin, *Limits* 6 (1996).

would reverse the trial court without remanding.

My colleagues have done a superb job in explaining why Indiana has a right to privacy. However, I question the conclusion that the source of that right may be found in Article I, section 1 of the Indiana Constitution. Our supreme court suggested that the right to privacy may instead be found in Article I, section 21. In *State ex rel. Mavity v. Tyndall,* our supreme court was faced with the issue of whether it was a violation of the Fourteenth Amendment to the United States Constitution and Article I, sections 1 and 21 of the Indiana Constitution for the police to hold the defendant's photographs and fingerprints pursuant to section 47–857, et seq. (Burns 1940). 225 Ind. 360, 74 N.E.2d 914 (1947) (superseded by statute on grounds other than the right to privacy). Our supreme court made short work of the Fourteenth Amendment and Article I, section 1 arguments, finding no support for the defendant's contentions therein. *Id.* at 363, 74 N.E.2d at 916. Although the statute was ultimately found not to violate Article I, section 21, our supreme court stated that a citizen "has a *right to privacy* and protection as guaranteed him by the constitutional provision quoted[, Article I, section 21.]" *Id.* at 365, 74 N.E.2d at 916. (Emphasis added). Although the parameters of the right to privacy were not well articulated in *Mavity,* the majority today has provided a thorough analysis of the roots of this right in the State of Indiana. Although *Mavity* was decided in the context of property rights, our supreme court did not in its opinion limit the right to privacy found in Article I, section 21 to property.

Therefore, as articulated by our supreme court, the right to privacy lies in Article I, section 21 of the Indiana Constitution.

Rights under the Indiana Constitution cannot hide within penumbras, but rather, "questions arising under the Indiana Constitution are to be resolved by examining the intent of the framers, the language of the text in the context of the history surrounding its drafting and ratification, and case law interpreting the specific provisions." *Jordan ex rel. Jordan v. Deery,* 778 N.E.2d 1264, 1268 (Ind.2002). Our supreme court indicated in *Matter of Lawrance,* 579 N.E.2d 32, 39 (Ind.1991), that the principle of liberty "include[s] the opportunity to manage one's own life except in those areas yielded up to the body politic." It appears then that the right to privacy is a core value in Indiana that does not necessarily spring from a particular provision of our constitution but is an amalgamation of provisions and case law and timing of the same.

The Indiana constitution provides equal or greater protection to its citizens than the federal constitution inasmuch as "the Indiana Constitution provides a great variety of protections for citizens which are not contained in the Federal Bill of Rights or elsewhere." *Ratliff v. Cohn,* 679 N.E.2d 985, 986 (Ind.Ct.App.1997). In 1973, the United States Supreme Court said that the right of privacy found in the federal constitution includes the right to obtain an abortion. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Abortion became a statutory right under Indiana Code section 16–34–2–1 that same year.[2] On January 18, 1977, Indiana be-

---

2. Indiana Code section 16–34–2–1 reads as follows:

(a) Abortion shall in all instances be a criminal act, except when performed under the following circumstances:

(1) During the first trimester of pregnancy for reasons based upon the professional, medical judgment of the pregnant woman's physician if:

(A) the abortion is performed by the physician;

came the thirty-fifth state to ratify the Equal Rights Amendment (ERA). Indiana Historical Society, "Indiana Women's Political Caucus Records, 1967–1983" *at* http://www.indianahistory.org/library/manuscripts/ collection—guides/m0709.html# HISTORICAL (last visited September 3, 2004). Although our General Assembly ratified the ERA, we were the last state to do so. Thus, the ERA fell three states short and was not ratified for the federal constitution. However, Indiana thereafter "degendered" its constitution, in effect ratifying the ERA for the Indiana Constitution. For example, the text of Article I, section 2 from the original 1851 constitution states that "All *men* shall be secured in the natural right to worship Almighty God, according to the dictates of their own consciences." Indiana Historical Bureau, "Indiana's Constitution of 1851 from original enrolled copy effective November 1, 1851" *at* http://www.statelib.lib.in.us/www/ihb/resources/constarticle1.html (last visited September 3, 2004) (emphasis added). In 1984, the current text of Article I, section 2 was adopted at the general election, and it states that "[a]ll *people* shall be secured in the natural right to worship Almighty God, according to the dictates of their own consciences." (Emphasis added). This ensured that our legal landscape included a right to privacy, which includes a woman's right to terminate her pregnancy. I therefore concur with the result as to Part I of the majority opinion. However, I do not believe it is necessary to remand this cause to the trial court.

When one considers the amalgamation of provisions and case law and their timing in relation to each other, it is apparent that a consensus among Hoosiers exists that both men and women should be treated equally by their government. The current statutory scheme, however, inherently treats men and women differently. Since the right to privacy exists, and that right includes the right to terminate a pregnancy under certain circumstances, the General Assembly cannot limit it arbitrarily and

(B) the woman submitting to the abortion has filed her consent with her physician. However, if in the judgment of the physician the abortion is necessary to preserve the life of the woman, her consent is not required; and

(C) the woman submitting to the abortion has filed with her physician the written consent of her parent or legal guardian if required under section 4 of this chapter.

(2) After the first trimester of pregnancy and before viability, for reasons based upon the professional, medical judgment of the pregnant woman's physician if:

(A) all the circumstances and provisions required for legal abortion during the first trimester are present and adhered to; and

(B) the abortion is performed in a hospital or ambulatory outpatient surgical center (as defined in IC 16–18–2–14).

(3) Except as provided in subsection (b), after viability of the fetus for reasons based upon the professional, medical judgment of the pregnant woman's physician if:

(A) all the circumstances and provisions required for legal abortion before viability are present and adhered to;

(B) the abortion is performed in compliance with section 3 of this chapter; and

(C) before the abortion the attending physician shall certify in writing to the hospital in which the abortion is to be performed, that in the attending physician's professional, medical judgment, after proper examination and review of the woman's history, the abortion is necessary to prevent a substantial permanent impairment of the life or physical health of the pregnant woman. All facts and reasons supporting the certification shall be set forth by the physician in writing and attached to the certificate.

(b) A person may not knowingly or intentionally perform a partial birth abortion unless a physician reasonably believes that:

(1) performing the partial birth abortion is necessary to save the mother's life; and

(2) no other medical procedure is sufficient to save the mother's life.

capriciously by placing a material burden upon it.

Under Article I, section 12, legislation interfering with a right must bear a rational relationship to a legitimate legislative goal. *McIntosh v. Melroe Co., a Div. of Clark Equip. Co., Inc.,* 729 N.E.2d 972, 975-76 (Ind.2000). Indiana Code section 16–34–2–1.1 is, by its own terms, an informed consent statute. As our supreme court has observed, "Under the doctrine of informed consent, a physician must disclose the facts and risks of a treatment which a reasonably prudent physician would be expected to disclose under like circumstances, and which a reasonable person would want to know." *Weinberg v. Bess,* 717 N.E.2d 584, 590 n. 5 (Ind.1999). Thus, the only plausible purpose of the eighteen-hour and in-person requirements is to provide information to the patient. My research has uncovered no medical procedure in Indiana other than abortion, which by definition can only be performed upon a woman, in which the attending physician is required to provide information in the patient's presence eighteen hours before the procedure. A woman's ability to make an informed decision about her own health is not affected by the fact that she is pregnant, and, therefore, there is no rational relationship to the legitimate government interest of providing medical information in requiring women to receive that information differently than men. Nothing indicates that women must receive medical information differently from men, and to suggest so is facially discriminatory.

In sum, I am convinced that it is unnecessary to remand to the trial court inasmuch as the eighteen-hour and in-person requirements are facially discriminatory and bear no rational relationship to the goal of providing information to the patient. These requirements do no more than unnecessarily hamper a woman's ability to exercise her rights, inasmuch as "[e]very human being of adult years and sound mind has a right to determine what shall be done with his [or her] own body." *Matter of Lawrance,* 579 N.E.2d at 38–39 (quoting *Schloendorff v. Soc'y of New York Hosp.,* 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914), overruled on other grounds). I would therefore reverse and remand this cause to the trial court with instructions to enter judgment for the plaintiffs, enjoining implementation of the in-person and eighteen-hour requirements.