**LEAGUE OF WOMEN VOTERS OF INDIANA, INC. and League of Women Voters of Indianapolis, Inc., Appellants–Plaintiffs,**

v.

**Todd ROKITA, in his official capacity as Indiana Secretary of State, Appellee–Defendant.**

No. 49A02–0901–CV–40.

Court of Appeals of Indiana.

Sept. 17, 2009.

William R. Groth, Fillenwarth Dennerline Groth & Towe, LLP, Karen Celestino–Horseman, Thomas N. Austin, Bruce G. Jones, Austin & Jones, P.C., Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Thomas M. Fisher, Solicitor General, Heather L. Hagan, Deputy Attorney General, Ashley E. Tatman, Deputy Attorney General, Indianapolis, IN, Attorney for Appellee.

**OPINION**

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Plaintiff, League of Women Voters of Indiana, Inc. and League of Women Voters of Indianapolis, Inc. (collectively the League), appeal the trial court's dismissal of their Amended Complaint for Declaratory Judgment seeking a judicial declaration that Indiana's Voter I.D. Law [1] violates the Indiana Constitution.

We reverse and remand with instructions.

### ISSUES

The League raises three issues on appeal, which we restate as the following three:

(1) Whether the trial court erred when it concluded that the Voter I.D. Law does not violate Indiana Constitution Article 2, Section 2;

(2) Whether the trial court erred when it concluded that the Voter I.D. Law did not violate Indiana Constitution Article 1, Section 23; and

(3) Whether the Voter I.D. Law is a reasonable, uniform, and impartial regulation of voters.

In rebuttal, the Appellee–Defendant, Indiana Secretary of State, Todd Rokita (Rokita), raises one additional issue: Whether the League's action for declaratory judgment is justiciable as filed with the Indiana Secretary of State being the only named defendant.

### FACTS AND PROCEDURAL HISTORY

In 2005, the Indiana General Assembly passed a law requiring "citizens voting in person on election day or casting a ballot in person at the office of the circuit court clerk prior to election day to present photo identification issued by the government." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, ——, 128 S.Ct. 1610, 1613, 170 L.Ed.2d 574 (2008). The Voter I.D. Law applies to voting in both primary and general elections. Ind.Code §§ 3–10–1–7.2 and 3–11–8–25.1. It does not apply, however, to voters casting absentee ballots by mail or those who happen to reside at a state licensed care facility where a precinct

---

1. What we refer to as the "Voter I.D. Law" is Public Law 109–2005, effective July 1, 2005, and is codified throughout several sections of Title 3 "Elections" and Title 9 "Motor Vehicles" of the Indiana Code.

polling place is located. I.C. §§ 3–10–1–7.2(e), 3–11–8–25.1(e), and 3–11–10–1.2.

To be an acceptable identification card, it must have been issued by the State of Indiana or the United States of America and must contain an expiration date which has not expired as of the time when the voter casts her ballot, or if it has, it did so after the most recent general election. I.C. § 3–5–2–40.5. The Voter ID Law additionally made free identification cards available to individuals who do not have a valid Indiana driver's license and who will be at least eighteen at the next election. I.C. § 9–24–16–10.

If a voter fails to present acceptable proof of identification, the voter can cast a provisional ballot and execute a challenged voter affidavit. I.C. §§ 3–11–8–25.1 and 3–10–1–7.2. If the voter wishes her provisional ballot to be counted she must appear before the circuit court clerk or the county election board before noon ten days following the election. I.C. §§ 3–11.7–5–1 and 3–11.7–5–2.5. Upon appearing, the voter can either (1) provide proof of identification and execute an affidavit that she was the person who cast the provisional ballot on election day; or (2) file an affidavit attesting to her religious objection to being photographed or averring that she is indigent and cannot obtain proof of identification without payment of a fee. I.C. § 3–11.7–5–2.5. Once a voter has taken one of these two steps, the county election board shall count the voter's ballot as long as no other challenge to the provisional ballot exists. *Id.*

On July 29, 2008, the League filed an amended complaint seeking a declaration that the Voter ID Law violates Article 2, Section 2 and Article 1, Section 23 of the Indiana Constitution. Specifically, the League contended in Count I that the Voter ID Law imposed a "new substantive qualification on the right to vote, not au-thorized by the Indiana Constitution." (Appellant's App. p. 6). The League acknowledged that, pursuant to 140 Indiana Administrative Code § 7–4–3, Indiana offers free identification to qualified voters who are able to establish their residence and identity by way of an original or certified copy of their birth certificate, certificate of naturalization, United States veterans photo identification, United States military photo identification, or a United States passport. However, the League alleged that "Indiana counties charge between $3 to $12 for a birth certificate, and in some other States the cost is much higher. The total fees for a U.S. passport are approximately $100." (Appellant's App. p. 4).

Further, the League alleged that in Marion County alone in the 2007 municipal election, 32 persons who submitted provisional ballots never produced a qualified form of identification and therefore their votes were not counted, despite the fact that "[m]ost of those voters had voted for several years at the same location." (Appellant's App. p. 6). Additionally, the League alleged that in St. Joseph County, 12 nuns were not permitted "to cast a regular or provisional ballot" because they did not have the required form of identification. (Appellant's App. p. 6). In Count II, the League contended that the Voter I.D. Law conferred a privilege upon voters voting by mail-in absentee ballot because those voters did not have to comply with the identification requirements.

On September 15, 2008, Rokita filed a motion to dismiss. On November 26, 2008, the trial court heard oral argument on the motion to dismiss and took the matter under advisement. On December 17, 2008, the trial court dismissed the League's lawsuit, concluding that the Voter ID Law was a procedural regulation, not a new qualification for voting, and that any

"classes" that were created by the Law were not arbitrary or unreasonable, but "reasonably relate to self-evident inherent characteristics that distinguish the different classes ... which were treated similarly." (Appellant's App. pp. 1–2). In dismissing the action, the trial ruled on the merits of the case, essentially entering a final judgment by its conclusion that the Voter I.D. Law did not violate Indiana Constitution Article 1, Section 23, or Article 2, Section 2.

The League now appeals. Additional facts will be presented as necessary.

## DISCUSSION AND DECISION

It is well settled that a complaint may not be dismissed for failure to state a claim upon which relief can be granted unless it is clear on the face of the complaint that the complaining party is not entitled to relief. We view the pleadings in the light most favorable to the nonmoving party and draw every reasonable inference in favor of that party. When reviewing a motion to dismiss for failure to state a claim, this court accepts as true the facts alleged in the complaint. We will affirm a successful Trial Rule 12(B)(6) motion when a complaint states a set of facts, which, even if true, would not support the relief requested in that complaint. We will affirm the trial court's ruling if it is sustainable on any basis found in the record.

*Bonner ex rel. Bonner v. Daniels,* 907 N.E.2d 516, 518 (Ind.2009) (quoting *City of New Haven v. Reichhart,* 748 N.E.2d 374, 377–78 (Ind.2001)) (internal citations omitted).

Additionally well settled is our standard of review when legislation is contended to violate our constitution:

> Every statute stands before us clothed with the presumption of constitutionality until that presumption is clearly overcome by a contrary showing. The party challenging the constitutionality of the statute bears the burden of proof, and all doubts are resolved against that party. If two reasonable interpretations of a statute are available, one of which is constitutional and the other not, we will choose that path which permits upholding the statute because we will not presume that the legislature violated the constitution unless the unambiguous language of the statute requires that conclusion.

*Wallace v. State,* 905 N.E.2d 371, 378 (Ind. 2009).

### I. *Is the Secretary of State an Appropriate Defendant?*

Rokita contends that the dismissal of the League's lawsuit was appropriate because the League failed to name a proper defendant. He contends that the Secretary of State of Indiana has many powers and duties related to elections, but the Secretary of State does not enforce election laws. The League responds by arguing that the Secretary of State instructs and advises election officials on election laws, including on the application of the Voter I.D. Law, and, therefore, its action for declaratory judgment is appropriately brought against the Secretary of State. In ruling on Rokita's motion to dismiss, the trial court ignored the issue of whether Rokita was a proper defendant.

Rokita contends that the case is not justiciable as filed against the Secretary of State, relying on language from *Alexander v. PSB Lending Corp.,* 800 N.E.2d 984, 989 (Ind.Ct.App.2003), that a plaintiff's alleged injury be "fairly traceable to the defendant" and "likely to be redressed by the requested relief." Rokita fails to explain that the *Alexander* court was refer-

encing the "federal test" when expressing the above requirement. *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). However, Indiana's constitution contains no "case or controversy" requirement as is contained in the federal constitution, and, therefore, "federal limits on justiciability have no direct applicability" but rather are merely instructive to our consideration of justiciability. *Schulz v. State*, 731 N.E.2d 1041, 1044 (Ind.Ct.App.2000), *trans. denied.* While we acknowledge the value of the guidance that federal legal precedents have provided when addressing certain issues related to justiciability,[2] we conclude that Indiana law governing declaratory judgments and justiciability is sufficient to address this issue.

The League's action is a request for declaratory judgment. Our legislature has adopted for Indiana the Uniform Declaratory Judgment Act. I.C. § 34–14–1–1 *et seq.* Pursuant to that Act, "Courts of record within their respective jurisdictions have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." I.C. § 34–14–1–1. Indiana Code section 34–14–1–11 provides in part that "If the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state shall also be served with a copy of the proceeding and be entitled to be heard." I.C. § 34–14–1–11. As such, the State was given ample opportunity to defend the Voter I.D. Law. Indiana Code section 34–14–1–12 provides: "This chapter is declared to be remedial. The pur-

pose of this chapter is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered."

Moreover, Rokita is the "chief election official" for the State of Indiana.[3] By statute, the Secretary of State is instructed to "perform all ministerial duties related to the administration of elections by the state." I.C. § 3–6–4.2–2. Rokita's duties include "advising and instructing local election officials" and the Election Division of the Secretary of State's office "can be used as an interpretive resource" on "general election law provisions."[4] The Indiana Secretary of State produces, through the Election Division, the Indiana Voter Information Guide, which informs the Indiana electorate of the Voter I.D. requirements. If Rokita instructed election officials and Indiana's electorate that the Voter I.D. Law was no longer enforceable, the League's alleged injury would be redressed. Therefore, we conclude that the League named a proper defendant in this matter.

## II. *Article 2, Section 2: Qualification or Procedural Regulation?*

■ The League concedes that its first claim relies upon a determination of whether the Voter ID Law is a procedural regulation or, as it contends, a substantive voting qualification. It contends that our legislature is prohibited from adding voter qualifications to those which exists in Indiana Constitution Article 2, Section 2. However, if the Voter I.D. Law is not a

---

2. *See, e.g., Save the Valley, Inc. v. Indiana–Kentucky Elec. Corp.*, 820 N.E.2d 677, 680 (Ind.Ct.App.2005), *trans. denied* (applying the federal associational standing test from *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 344, 97 S.Ct. 2434, 2442, 53 L.Ed.2d 383 (1977), to proceedings for administrative review in Indiana), *trans. denied.*

3. http://www.in.gov/sos/elections/pdfs/2008ElectionAdminManual.pdf, pp. 3, 6 (last visited July 30, 2009).

4. http://www.in.gov/sos/elections/pdfs/2008ElectionAdminManual.pdf, p. 7 (last visited July 30, 2009).

qualification, but rather a regulation of otherwise qualified voters, then it does not violate Article 2, Section 2.

Pursuant to Article I, section 4, clause 1 of the federal constitution, States hold the power to regulate the time, place, and manner of federal elections, which power is matched by state control over the elections for state offices. *Clingman v. Beaver*, 544 U.S. 581, 586, 125 S.Ct. 2029, 2035, 161 L.Ed.2d 920 (2005). In *Indiana Democratic Party v. Rokita*, 458 F.Supp.2d 775, 784 (S.D.Ind.2006), the district court held that the Voter I.D. Law "is a constitutionally-valid, reasonable time place, and manner restriction on voting and on voters." Additionally, the district court concluded that the plaintiff's had failed to demonstrate that the Voter I.D. Law violated Indiana Constitution Article 2, Section 2. *Id.* at 883. However, upon grant of a writ of certiorari, the Supreme Court did not enunciate such a direct proclamation. Justice Stevens, with Chief Justice Roberts and Justice Kennedy concurring, and Justices Scalia, Thomas, and Alito concurring by way of separate opinion, summarized that "we cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters." *Crawford*, 128 S.Ct. at 1623 (2008) (quoting *Storer v. Brown*, 415 U.S. 724, 738, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)). "The application of the statute to the vast majority of Indiana voters is amply justified by the valid interest in protecting 'the integrity and reliability of the electoral process.'" *Crawford*, 128 S.Ct. at 1624 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788, n. 9, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)). Moreover, the *Crawford* Court did not make any ruling whatsoever regarding the Voter I.D. Law and the Indiana Constitution.

Decisions of a federal district court may be persuasive, but they are not binding authority on state courts. *Plaza Group Properties, LLC v. Spencer County Plan Com'n*, 877 N.E.2d 877 (Ind.Ct.App. 2007), *trans. denied*. More directly on point, interpretation of the Indiana Constitution is an "independent judicial act in which federal cases play only a persuasive role." *Priest v. State*, 270 Ind. 449, 453, 386 N.E.2d 686, 689 (1979).

Indiana Constitution Article 2, Section 2 provides:

> (a) A citizen of the United States, who is at least eighteen (18) years of age, and who has been a resident of a precinct thirty (30) days immediately preceding an election, may vote in that precinct at the election.
>
> (b) A citizen may not be disenfranchised under (a), if the citizen is entitled to vote in a precinct under (c) or federal law.
>
> (c) The General Assembly may provide that a citizen who ceases to be a resident of a precinct before an election may vote in a precinct where the citizen previously resided if, on the date of the election, the citizen's name appears on the registration rolls for the precinct.

In *Morris v. Powell*, 125 Ind. 281, 25 N.E. 221 (1890), the validity of a statute which required, among other things, that voters who had been absent from Indiana for a period of six months or more on business of the State or of the United States produce a certificate from the county auditor stating that his name had continuously been on the tax rolls of the county during his absence from Indiana. *Id.* at 286, 25 N.E. at 223. Our supreme court noted that, because of the manner in which tax rolls were kept, this requirement added a property ownership qualification for some voters who would otherwise meet the qualifications to vote according to Article 2.[5]

---

**5.** The qualifications included in Article 2 at

the time were that the person "be a male

*Id.* at 287, 25 N.E. at 223. Acknowledging that the statute added a qualification for certain voters beyond those contained in our constitution, our supreme court held:

> The Legislature has no such power. That when the people by the adoption of the Constitution have fixed and defined in the Constitution itself what qualifications a voter shall possess to entitle him to vote, the Legislature can not add an additional qualification is too plain and well recognized for argument, or to need the citation of authorities. The principle is elementary that when the Constitution defines the qualification of voters, that qualification can not be added to or changed by legislative enactment.

*Id.* 287–88, 25 N.E. at 223.

Another aspect of the statute addressed in *Morris* was a "portion of the section providing for certain persons to register before being entitled to vote." *Id.* at 288, 25 N.E. at 223. At the time, Article 2 provided for a system of registration, but our analysis is particularly benefitted by the *Morris* court's discussion of what the effect of a registration law would be in absence of constitutional provision. Our supreme court noted that:

> Courts differ as to the effect of a law requiring the registration of voters in states wherein the constitution defines the qualifications of voters, and is silent upon the question of registration; some courts holding registration to be a mere regulation as to the mode of exercising the right of suffrage, while other courts, and *we think the better reasoned opinions, hold it to be adding a qualifica-*

*tion.* [ ] When such a registration law is enacted the voter then must possess the qualification of being a male citizen of the United States, 21 years of age, or over, and must have resided in the state 6 months, in the township 60 days, in the ward or precinct 30 days, and must be duly registered according to law. *If he possess all these qualifications, he can vote; if he lacks either, he cannot vote.*

*Id.* at 289, 25 N.E. at 233(emphasis added). The *Morris* court went on to add the plain statement, "[w]hen a valid law for the registration of all voters shall have been enacted as required by the constitution, then registration will be as much a qualification as age or residence." *Id.* at 289, 25 N.E. at 224.[6]

So, is a requirement to display a government issued photo identification a qualification for voting that has been added by our legislature? The requirement to display a photo identification by nature seems to be of a different genus than property ownership, age, gender, citizenship, and residency. However, when compared to a system of registration the photo identification requirement is a qualification if we are to follow the precedent in *Morris*. The *Morris* court directly stated when addressing another aspect of the statute being considered, "[i]t matters not whether this provision of the law be termed a registration of voters or a provision requiring certain proof of the class of voters named to entitle them to vote." *Id.* at 295, 25 N.E. at 226. Registration and photo identification serve a similar purpose: the prevention of voter fraud. And the impact upon

---

citizen of the United States ... be twenty-one years of age, and have resided in [Indiana] six months, and in the township sixty days, and in the precinct thirty days, and he must be duly registered...." *Id.* at 285, 25 N.E. at 222.

6. At the time when the *Morris* court addressed the challenged election law Art. 2, Section 2 contained the caveat "if he shall be duly registered according to law" and Art. 2 § 14 provided that the "general assembly ... shall provide for the registration of all persons entitled to vote."

otherwise qualified voters who do not have a photo identification would be the same as those who are unable or do not make the effort to register: they are not permitted to vote.

That being said, since *Morris,* our supreme court has changed course in its interpretation of whether voter registration is a qualification which requires constitutional provision or merely regulation of otherwise qualified voters. First, in *Simmons v. Byrd,* 192 Ind. 274, 136 N.E. 14 (Ind.1922), our supreme court explained:

> Being charged by the Constitution with the duty to "provide for the registration of all persons entitled to vote," and to enact such law governing registration and the holding of elections "that all elections shall be free and equal," the Legislature has power to determine what regulations shall be complied with by a qualified voter in order that his ballot may be counted, so long as what it requires is not grossly unreasonable that compliance therewith is practically impossible..

*Id.* at 286, 136 N.E. at 18. This passage alone may lead to the deduction that our supreme court still viewed the General Assembly's authority "to determine what regulations shall be complied with" as nothing more than a progression of the enforcement of the registration qualification articulated in the Constitution. However, the *Simmons* court went on to explain by way of example:

> Requiring voters to appear at the polling booth between certain hours on election day and to cast their ballots in person involves inconvenience, and some voters find themselves unable to attend at the time fixed. But that fact does not make a statute unconstitutional which provides when the polls shall open and close, and permits none to vote except those who cast their ballots in person during the hours when they are open.

*Id.* The use of polling hours as a conceptual aid, and our supreme court's acknowledgement that such polling hours may lead to the disenfranchisement of some voters, leads us to believe that our supreme court was abandoning its rationale in *Morris* that a regulation by our legislature that results in the disenfranchisement of voters is a qualification which must be brought to bear by constitutional provision.

Our supreme court again addressed the constitutionality of voter registration in *Blue v. State ex rel. Brown,* 206 Ind. 98, 188 N.E. 583 (1934), *overruled on other grounds by Harrell v. Sullivan,* 220 Ind. 108, 40 N.E.2d 115 (1942), *reh'g denied,* over forty years after its opinion in *Morris.* Blue and others brought an action which challenged, in part, the constitutionality of the voter registration law in place at that time.[7] They contended, *inter alia,* that a certain class of voters, fully qualified to vote pursuant to Article 2, Section 2 of the Indiana Constitution, would be prohibited from voting due to inability to register to vote caused by sickness or travel, or that some who actually registered would possibly be disenfranchised by way of error or mistake on the part of registration officials. The *Blue* court concluded that these possibilities did not cause the registration statute to run afoul of the right to vote noting that the simple fact that some voters would be disenfranchised by circumstance was not the fault of the law. *Id.* at 105–106, 188 N.E. at 586. In doing so, the *Blue* court quoted with approval a legal encyclopedia of the time for the following proposition:

---

7. 1933 Ind. Acts p. 886 c. 178.

It is a general rule that *in the absence of constitutional inhibition, the legislature may adopt registration laws if they merely regulate in a reasonable and uniform manner how the privilege of voting shall be exercised.* It is true that the Constitution by prescribing the qualifications of those who may vote confers upon persons coming within the class so created a right to vote which can not be abridged by the legislature, and, therefore, the theory upon which registration laws may be supported is that they do not impair or abridge the elector's privilege but merely regulate its exercise by requiring evidence of the right. *The fact that a constitutionally qualified voter may be prevented from voting through failure to comply with the law does not necessarily invalidate it,* provided he be afforded a reasonable opportunity to register before the election.

*Id.* at 107, 188 N.E. at 586 (quoting 9 R.C.L. § 52, p. 1036) (emphasis added). Our supreme court stated that it was "firmly convinced" that the above statement of law "is correct." *Id.*

From this language, we find it apparent that our supreme court has departed from its conclusion in *Morris* that in the absence of constitutional provision a voter registration law is qualification of voters which cannot be added by our legislature. Because of the similarities in voter registration programs and the Voter I.D. Law, we find no reason why the similar conclusion would not apply here. As such, we conclude that the Voter I.D. Law is not a qualification, but is rather a regulation of the time, place, or manner in which otherwise qualified voters must cast their votes. Therefore, if the Voter I.D. Law is to run afoul of our constitution, it is not for the reason that it imposes a qualification upon our electorate in the absence of constitutional provision.

### III. *Article 1, Section 23*

The League contends that the Voter I.D. law violates Article 1, Section 23 (Section 23) of the Indiana Constitution, otherwise known as the Equal Privileges and Immunities Clause, which provides: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." The analytical process for determining whether a statute which treats certain citizens differently than others passes muster under the Equal Privileges and Immunities Clause was summarized in *Collins v. Day,* 644 N.E.2d 72, 80 (Ind.1994), as follows:

First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated. Finally, in determining whether a statute complies with or violates Section 23, courts must exercise substantial deference to legislative discretion.

 "Legislative classification becomes a judicial question only where the lines drawn appear arbitrary or manifestly unreasonable, and the challenger must negate every reasonable basis for the classification." *W.C.B. v. State,* 855 N.E.2d 1057, 1063 (Ind.Ct.App.2006), *trans. denied.* Furthermore, Section 23 differs from analysis under the equal protection clause of the Fourteenth Amendment of the federal constitution. Specifically, it does not "require an analytical framework applying varying degrees of scrutiny for different protected interests." *Id.*

The League contends that three aspects of the Voter I.D. Law violates Section 23:(1) the disparate treatment between mail-in absentee voters and in-person vot-

ers; (2) the disparate treatment between voters who reside at state licensed care facilities that by happenstance are polling places and elderly and disabled voters who do not reside at state licensed care facilities that also happen to be polling places; and (3) the requirements that an identification contain an expiration date and photograph is not reasonably related to the purpose of the statute.

### A. Mail-in Voters versus In–Person Voters

 Indiana Code section 3–11–10–1.2 provides: "An absentee voter is not required to provide proof of identification when: (1) mailing, delivering, or transmitting an absentee ballot under section 1 of this chapter; or (2) voting before an absentee board under section 25 of this chapter." The League first contends, relevant to the disparate treatment between mail-in and in-person voters, that "the claimed distinctions between" these groups "do not support the claimed purpose of the" Voter I.D. Law.[89] (Appellant's Br. p. 32). The crux of the League's contention is that mail-in voters are not required by law to execute an affidavit regarding their identity, but in-person voters are required to produce a government issued photo identification card which contains an expiration date. The League directs our attention to our supreme court's decision in *Horseman v. Keller*, 841 N.E.2d 164 (Ind.2006). In *Horseman*, the trial court declared Indiana Code section 3–12–1–13 unconstitutional because it did not allow mailed-in absentee ballots lacking two sets of clerks' initials to be counted in a recount although ballots cast in-person, but lacking two sets of clerks' initials, could be counted in the recount. Our supreme court declared to the contrary that the statute was constitutional, because inherent differences make mailed-in ballots more susceptible to improper influences or fraud, and, therefore, "it is reasonable

---

8. The League does not articulate an argument with respect to absentee voters who vote before an absentee board.

9. The opportunity to vote by mail is defined by Indiana Code section 3–1 1–10–24(a), which provides that:

Except as provided in subsection (b), a voter who satisfies any of the following is entitled to vote by mail:

(1) The voter has a specific, reasonable expectation of being absent from the county on election day during the entire twelve (12) hours that the polls are open.

(2) The voter will be absent from the precinct of the voter's residence on election day because of service as:

(A) a precinct election officer under IC 3–6–6;

(B) a watcher under IC 3–6–8, IC 3–6–9, or IC 3–6–10;

(C) a challenger or pollbook holder under IC 3–6–7; or

(D) a person employed by an election board to administer the election for which the absentee ballot is requested.

(3) The voter will be confined on election day to the voter's residence, to a health care facility, or to a hospital because of illness or injury during the entire twelve (12) hours that the polls are open.

(4) The voter is a voter with disabilities.

(5) the voter is an elderly voter.

(6) The voter is prevented from voting due to the voter's care of an individual confined to a private residence because of illness or injury during the entire twelve (12) hours that the polls are open.

(7) The voter is scheduled to work at the person's regular place of employment during the entire twelve (12) hours that the polls are open.

(8) The voter is eligible to vote under IC 3–10–11 or IC 3–10–12.

(9) The voter is prevented from voting due to observance of a religious discipline or religious holiday during the entire twelve (12) hours that the polls are open.

(10) The voter is an address confidentiality program participant (as defined in IC 5–26.5–1–6).

(11) the voter is a member of the military or public safety officer.

that the legislature believed it in the interest of Indiana voters to more stringently govern absentee balloting." *Id.* at 173.[10] Because of this conclusion, the League contends that it is irrational for our legislature to require identification of in-person voters but not require an affidavit affirming the identity of mail-in voters. We agree.

If it is reasonable to "more stringently govern absentee balloting," then it follows that a statute that imposes a less stringent requirement for absentee voters than for those voting in person would not be reasonable. This is what the Voter I.D. law does.

### B. *Voters Not Residing at a State Licensed Care Facility versus Those Who Do*

■ Indiana Code sections 3–10–1–7.2 and 3–11–8–25.1 provide that "[a] voter who votes in person at a precinct polling place that is located at a state licensed care facility where the voter resides is not required to provide proof of identification before voting in" a primary election or in an election. The League contends that this preferential treatment violates both prongs of Section 23 analysis.

We first notice when reviewing the arguments of the parties with respect to the second prong they propose different definitions of those similarly situated. The State contends that those similarly situated is just what the statute says—persons who reside at a state licensed care facility which also happens to be a polling place. However, the League would have us more broadly define those similarly situated by acknowledging that persons who reside at health care facilities are the disabled and elderly, thereby framing the interpretation

so that it becomes apparent when the second prong analysis is performed that the disabled and elderly are treated unequally under the Voter I.D. law. It seems that these differing positions stem from different views of what are the inherent and natural characteristics of the class, which is not surprising considering the overlap amongst the concepts of "classification" and "similarly situated."

■■ As we stated above the "classifications must be 'just,' 'natural,' 'reasonable,' 'substantial,' 'not artificial,' 'not capricious,' and 'not arbitrary.' " *Collins,* at 79. Moreover, the basis of the classification must "inhere in the subject matter." *Id.* at 78. In *Heckler v. Conter,* 206 Ind. 376, 187 N.E. 878 (1933), one of the cases relied upon by the *Collins* court to articulate the first prong of our analysis, it was said regarding classes:

> The distinctions must involve something more than mere characteristics which will serve to divide or identify the class. There must be inherent differences in situation related to the subject matter of the legislation which require, necessitate, or make expedient different or exclusive legislation with respect to the members of the class. The classification must embrace all who possess the attributes or characteristics which are the basis of the classification, and their differences from those excluded must be substantial and related to the purpose of the legislation.

*Id.* at 381, 187 N.E. at 879–880. So, is a class of persons who reside at a state licensed care facility that by happenstance serves as a polling place a classification

---

**10.** This conclusion is also supported by reference to *Pabey v. Pastrick,* 816 N.E.2d 1138, 1140 (Ind.2004), wherein our supreme court noted that the trial court had found that 155 mailed in absentee ballots, roughly seven and a half percent of the absentee ballots casted in the contested election, were invalid.

that passes muster under the Equal Privileges and Immunities Clause?

The State contends that by conferring the privilege to be free of the identification requirement upon those who reside at state licensed care facilities:

The General Assembly was simply acknowledging and accommodating a few basic self-evident realities: (1) regardless of where they live, all seniors and disabled voters can vote absentee and need not provide photo identification in doing so; (2) seniors and the disabled living in licensed care facilities that are *not* polling places may be likely to vote absentee in order to avoid the travel required for voting; (3) seniors and the disabled who live in care facilities that *are* polling places may be more likely to vote in person because they will not have to travel to do so; (4) seniors and the disabled who live in care facilities would likely have particular difficulty traveling to obtain photo identification; and (5) seniors and the disabled who vote in person in the facilities where they live are likely to be identifiable as residents by election officials *and* unlikely to commit fraud by intentionally misidentifying themselves.

(Appellee's Br. pp. 32–33) (emphasis supplied). First, we note that the way in which the State describes the "realities" conveys that they accept that old age or disability is a natural, inherent characteristic of the classification. Each proposed "reality" refers to "seniors and the disabled." Thus, the question that remains is whether residing at a state licensed care facility which also happens to be a polling place is a natural or inherent characteristic.

The enumerated contentions by the State do not support a conclusion that either the class created by the Indiana Code sections 3–10–1–7.2 and 3–11–8–25.1 is based on natural or inherent characteristics, or that it treats all similarly situated uniformly. Moreover, the first enumerated "reality" contended by the State calls into question the "requirement," "necessity," or "expediency" of the privilege conferred upon those who reside at state health care facilities that are polling places. If these voters can vote without identification by mailing their vote just as any other elderly or disabled person, then why would the privilege be required, necessary, or expedient as required by *Heckler?*

As for the second and third "realities" contended by the State, they are nothing more than an acknowledgment that certain persons will take advantage of the privileges afforded them. As for the fourth "reality" contended by the State, the difficulty of obtaining an identification is shared by all elderly and disabled, so acknowledging this reality supports a conclusion that similarly situated persons are not being treated uniformly as required by the second prong of Section 23 analysis. And, as for the fifth "reality" proposed by the State, in many communities voters will be recognized by election officials. Further, the State contends that residents of state licensed care facilities which happen to be polling places will be easily "identifiable as residents." (Appellant's Br. p. 33). This would not prevent a resident from assuming the identity of another resident who may choose not to vote or be unable to vote for one reason or another.

In *Collins,* our supreme court relied, in part, upon *Dixon v. Poe,* 159 Ind. 492, 65 N.E. 518 (1902), to craft the second prong of Section 23 analysis. *Collins,* 644 N.E.2d at 79. The statute at issue in *Dixon* prohibited "merchants" from paying coal miners with tickets or tokens which could be exchanged for merchandise. Our supreme court found the act to be a viola-

tion of the Equal Privileges and Immunities Clause.

The mechanic, the farmer, the professional man, the banker or broker may lawfully take an assignment of the wages of the coal miner, and, in consideration of such transfer, may issue to the miner a check, ticket, or token payable only in merchandise, work, produce, professional services, or depreciated notes or currency.

\* \* \*

Laborers and employ'es engaged in a particular industry, who are no less intelligent and no less competent to care for their own interests than laborers and employ'es pursuing other occupations, are by the statute singled out and authorized to avoid their express agreements, when, under like circumstances, such other laborers and employ'es enjoy no such privilege. The law does not embrace all of the class to which it is naturally related. It creates a preference, and establishes an inequality among a class of citizens all of who are equally meritorious. It applies to persons in certain situations, and excludes from its effect other persons who are not dissimilar in these respects. Leaving the miner and the merchant free to deal with all other citizens, the act disqualifies them from contracting with each other.

*Dixon,* 159 Ind. at 495–496, 65 N.E. at 519.

Another precedent relied upon by the *Collins* court was *State Board of Barber Examiners v. Cloud,* 220 Ind. 552, 44 N.E.2d 972 (1942). In *Cloud,* our supreme court found a Huntington County Ordinance which set minimum prices and hours of operation for barber shops to be unconstitutional. The *Cloud* court acknowledged that the nature of barber shops made them subject to certain regulations to promote sanitation, "[b]ut the right to regulate for some purposes and in some ways does not include the right to regulate for all purposes in all ways." *Id.* at 561, 44 N.E.2d at 976.

Using the precedents of *Dixon* and *Cloud,* we conclude that the class created by Indiana Code sections 3–10–1–7.2 and 3–11–8–25.1 is based in part upon an arbitrary or unnatural characteristic which grants an unequal privilege or immunity to residents of state licensed care facilities which also happen to be polling places and fails to treat persons similarly situated uniformly. The nature of state licensed care facilities and the inherent natural characteristics of the residents who reside in them may make them subject to certain directed legislation, but the Voter I.D.'s grant of immunity from the identification requirement for in-person voters is not appropriately related to those characteristics. Moreover, the privilege or immunity granted those persons in the class is unnecessary when it is acknowledged that those residing at state licensed care facilities already have an opportunity to vote absentee without showing identification. Therefore, we conclude that Indiana Code sections 3–10–1–7.2 and 3–11–8–25.1 violate the Equal Privileges and Immunities Clause.

### C. *Photograph and Expiration Date Requirements*

The League also contends that the Voter I.D. Law's requirement that government issued identifications contain a photograph and expiration date create a class of unequally treated persons not supported by inherent characteristics. To support their argument on this point they note that the Veterans Universal Access Identification Card does not contain an expiration date. Additionally, the League states that a Medicare identification card contains no photograph, and, therefore,

cannot be used as an identification for voting. The League contends that both of these forms of identification are credible, and therefore, the requirement of a date and photograph are "not reasonably related to preventing in-person voting fraud." (Appellant's Br. p. 41). Furthermore, the League complains that certain election officials have applied this law in ways that create a class, explaining that Purdue University students were recently permitted to vote using their student identification despite the fact that no expiration date appears on the identification, and military identifications were used to satisfy the law despite the fact that the expiration date is listed as "INDEF". (Appellant's Br. p. 39). The State responds to this argument by stating that it was not raised to the trial court and has therefore been waived, and waiver notwithstanding, is not appropriate in a facial attack of the Voter I.D. Law.

Irrespective of whether this contention was raised below, we fail to see how the Voter I.D. Law's requirement of a photograph and expiration date creates a class of voters. The requirement is general and applies to all voters who wish to vote in-person. Moreover, the League's contention that the statute is being applied unequally by permitting Purdue University students and those with military identifications to vote despite a lack of specific expiration date is not properly brought in this facial attack of the Voter I.D. Law.

### IV. *Uniform Application*

 The League also contends that the Voter I.D. Law runs afoul of another aspect of our governing election law: all voter qualifications must be uniform. Rokita does not respond to this contention by the League.

██ We first note that the Leagues's contention, as framed, fails because it depends upon our determination that the Voter I.D. law imposes a qualification. As we will explain below, the requirement of uniformity should apply to regulations as well as qualifications. The League quotes from the *Morris* court wherein it stated that the "*qualifications* of voters must be uniform. One voter must possess the same as another, and he need possess no more. Where, as under our Constitution, registration is a qualification, one voter can not be required, by a law, to register, while another has the right to vote without registering." *Morris*, 125 Ind. at 289, 25 N.E. at 224 (emphasis added). This necessity of uniformity in election laws was also referenced in both *Simmons* and *Blue*. While only focused on the system of registration, the *Simmons* court included in its analysis a quotation from *Morris* that "the General Assembly has the power to enact a law providing for a uniform system of registration of all voters ... and that is made the duty of the General Assembly by the Constitution to enact a law providing a reasonable, uniform and impartial system for the registration of all voters must be conceded." *Simmons*, 192 Ind. at 282, 136 N.E. at 16 (quoting *Morris*, 125 Ind. at 285–86, 25 N.E. at 222). In addition to its conclusion that registration laws were reasonable regulations and not qualifications, the *Blue* court quoted to COOLEY ON CONSTITUTIONAL LIMITATIONS (8th Ed.) vol. 2, for the following proposition: "All regulations of the elective franchise, however, must be reasonable, uniform, and impartial; they must not have for their purpose directly or indirectly to deny or abridge the constitutional right of citizens to vote, or unnecessarily to impede its exercise; if they do, they must be declared void." *Id.* at 111, 188 N.E. at 588. Additionally, the *Blue* court stated: "It is for the Legislature to furnish a reasonable regulation under which the right to vote is to be exercised, and it is uniformly held that it may adopt

registration laws if they merely regulate in a reasonable and uniform manner how the privilege of voting shall be exercised." *Id.* at 107, 188 N.E. at 586. Thus, it appears that although the *Simmons* and *Blue* courts abandoned the *Morris* court's interpretation that registration laws are qualifications, they carried forward the *Morris* court's acknowledgement that voter qualifications must be reasonable, uniform, and impartial, and applied the concept to *regulations* of otherwise qualified voters.

The League does not provide much insight into the bounds or manner of application of the uniformity requirement in *Morris, Simmons,* and *Blue.* Nor does the League elucidate from where the legal proposition originated. Furthermore, the League does not explain why or if uniformity should be considered independently of a consideration of reasonableness and impartiality, or to what extent the purpose of the regulation effects the consideration of uniformity. It merely contends that uniformity is a requirement of voter qualification and contends that the Voter I.D. Law "is not universally applicable to all voters in that it does not apply to voters who mail in an absentee ballot or those who live in a state-certified residential facility housing the voter's polling place." (Appellant's Br. p. 28).

We note that in a more recent decision from our supreme court considering differential treatment of absentee ballots from in-person election-day ballots was reviewed in the context of the Equal Privileges and Immunities Clause but no analysis was performed pursuant to a uniformity requirement stemming from *Morris.* *See Horseman,* 841 N.E.2d at 172 (holding that differential treatment of absentee ballots did not violate the Equal Privileges and Immunities Clause). *Morris, Simmons,* and *Blue* did not consider the application of Section 23.

The significance of a uniformity requirement for election regulation may be gleaned, at least in part, by a provision of the former Article 2, Section 2, which was in effect at the time of the *Morris* decision, namely the provision providing that men of foreign birth who "shall have declared his intention to become a citizen of the United States, conformably to the Laws of the United States on the subject of naturalization, shall be entitled to vote ... if he shall have been duly registered according to law" and met other residency requirements. The *Morris* court provided an extensive dialogue on its rationale for addressing a uniformity requirement for voter qualifications, by stating:

> Indeed, it seems to us to be beyond controversy that if the present act can be upheld, aimed, as it is, at a class of traveling men, and men whom business of a public or private character, or ill health, may take from the state six months, and persons who may be required to move from one county to another to obtain employment within six months preceding an election, and imposing, as it does, a burden upon these classes of citizens which is imposed upon none other, then the legislature may enact a valid law relating to any class, *designating them by nationality, place of birth, religious belief,* professional or business pursuits, and require them, and none others, to register. If this law, which requires a registration of this class of citizens 90 days before an election, is valid, then any class of voters may be singled out and burdened, and duties imposed upon them which are not imposed upon others, and obstructing their right of suffrage as given to them by the constitution of the state.

*Id.* at 295, 25 N.E. at 225–226 (emphasis added). We also note that the quotes which we have laid out from the *Blue*

decision come in two distinct sections of that opinion: once in the *Blue* court's discussion of qualifications versus regulations; and the latter in its discussion of whether the act in question violated Article 2, Section 1, which provides that "all elections shall be free and equal."

Furthermore, we must keep in mind that while our legislature is charged with the task of regulating elections, the significance which elections serve in our system of government makes that task unique from any other charged to our legislature.

> We are clear, however, that elections do not "belong to the political branch of government," if by that term is meant the legislative branch of the government. Elections belong to the sovereign people. The qualifications of electors and other matters concerning elections are prescribed by the Constitution. The Legislature may set up machinery for the conduct of elections, and delegate to ministerial or executive agencies the duty of conducting elections, and may prescribe the procedure by which elections may be contested, so long as they stay within their constitutional powers, and such procedure conforms to the law, such steps and procedure will be governed by the legislative rules prescribed. But courts have inherent power to protect the sovereign people, and those who are candidates for office or claiming title to or rights in an office from fraud or unlawfulness.

*State ex rel. Nicely v. Wildey,* 209 Ind. 1, 8–9, 197 N.E. 844, 847 (1935).

 We have no indication from our supreme court that the legal proposition requiring that the regulation of electors and elections be reasonable, uniform, and impartial has been subsumed by the two-prong Section 23 analysis, and, therefore, we must consider it to be a viable independent analysis from Equal Privileges and Immunities Clause in spite of the fact that both address uniformity. Indeed, Section 23 analysis requires only that those similarly situated be treated uniformly once a class is carved out by our legislature, but we find no such limitation in *Morris, Simmons,* or *Blue.* All qualified voters must be treated uniformly and impartially. We fail to see how the Voter I.D. Law's exception of those residing in state licensed care facilities, which happen to also be a polling place, would be a uniform or impartial regulation. Furthermore, the Voter I.D. Law treats in-person voters disparate from mail-in voters, conferring partial treatment upon mail-in voters.

 It seems that the inconsistent and impartial treatment favoring voters who reside at state care facilities which also happen to be polling places could be excised from the Voter I.D. Law without destroying the primary objectives of the Law. However, the same cannot be said for the inconsistent and partial treatment favoring absentee voters who choose to mail their votes without destroying the opportunity for mailing votes. There may be different ways in which the inconsistent and partial treatment of the Voter I.D. Law could be cured, but it is not our task to form suggestions for legislation. *See State ex rel. Indiana State Bd. of Finance v. Marion County Superior,* 272 Ind. 47, 52, 396 N.E.2d 340, 344 (1979) ("Our constitution is clear that the judicial department cannot exercise any of the functions of either the legislative department or executive...."). Therefore, we must reverse and remand, with instructions to the trial court that it enter an order declaring the Voter I.D. Law void.

## CONCLUSION

Based on the foregoing, we conclude that the Voter I.D. law violates Indiana Constitution Article 1, Section 23, and

must be declared void because it regulates voters in a manner that is not uniform and impartial.

Reversed and remanded.

KIRSCH, J., and MATHIAS, J., concur.